proper); *Webb v. Joyce Real Estate, Inc.,* 108 Md.App. 512, 517 n. 2, 672 A.2d 660, 662 n. 2 (1996) (where this Court determined that trial court properly granted summary judgment in defendant's favor on ground that defendant had no notice of flaking paint, but stated in *dicta* that trial court could have granted summary judgment in defendant's favor where plaintiff "offered no evidence of the presence of lead-based paint" and plaintiffs were diagnosed with lead poisoning several weeks after moving from premises); *Bartholomee v. Casey,* 103 Md.App. 34, 40, 58, 651 A.2d 908, 911, 919–20 (1994) (evidence was insufficient to support finding of negligence on part of rental property owners where plaintiff failed to present evidence that property had been tested for lead-based paint, evidence indicated that plaintiff had been exposed to lead-based paint at other locations, and plaintiff failed to establish that defendant was made aware of flaking paint), *cert. denied,* 338 Md. 557, 659 A.2d 1293 (1995).

796 A.2d 145

**Donnell J. CROSS a/k/a Clayton Vaughn Cross**

v.

**STATE of Maryland.**

No. 2323, Sept. Term, 2000.

Court of Special Appeals of Maryland.

April 11, 2002.

78

Geraldine K. Sweeney, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Devy Patterson Russell, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Patricia Jessamy, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Submitted before DAVIS, DEBORAH S. EYLER and KRAUSER, JJ.

DEBORAH S. EYLER, Judge.

Donnell Joseph Cross, a/k/a Clayton Vaughn Cross, the appellant, was convicted by a jury in the Circuit Court for Baltimore City (Allen L. Schwait, J.) of first degree murder, first degree assault, use of a handgun in the commission of a felony, wearing, carrying and transporting a handgun, and possession of a regulated firearm by a convicted felon. Judge Schwait sentenced the appellant to a term of life imprisonment for the conviction of first degree murder; a consecutive term of twenty years' imprisonment for the conviction of use of a handgun in the commission of a felony; and a concurrent term of twenty years' imprisonment for the conviction of possession of a handgun by a convicted felon. The remaining convictions were merged.

On appeal, the appellant presents one question, which we have reworded:

> Did the trial court err in finding that two of the State's witnesses were unavailable and on that basis permitting the presentation of videotaped testimony from a prior proceeding?

For the following reasons, we shall affirm the judgments of the circuit court.

## FACTS AND PROCEEDINGS

The appellant was charged with first degree murder and related offenses in the killing of Carlton Finch. His first trial, which lasted from November 29 to December 6, 1999, resulted in a mistrial after the jury hung. The appellant was retried in September 2000.

Katina[1] Wise testified for the State at the appellant's first trial. Her testimony, which was videotaped, was as follows:

---

1. Katina is spelled "Catina" in parts of the record.

On April 29, 1999, Wise was living alone at 110 South Monroe Street in Baltimore City. She had known the appellant for a long time before then, but did not see him often. The appellant had spent the previous night at her apartment, and had left during the afternoon.

Wise planned to have a "strip party" on the night of April 29. She explained that a "strip party" is a party where "[t]he females dance with basically nothing on. They receive money." At around 8:00 or 9:00 that night, the appellant returned to Wise's apartment with three friends. The appellant left, but his friends stayed. The party started at around 10:00 or 11:00 that night.

Christine Willis, Lakala McCloud, Renoda Benn, and a girl named Jada, all friends of Wise, were at Wise's apartment with her. Some time after the party started, but before the women started dancing, four men knocked on the door. One of the men was Carlton Finch, who was known as "Smoky." Benn let Finch and his friends in. Wise had thought that it was a different "Smoky" who was at the door, and was unhappy about Finch's presence in her apartment. One of Finch's friends, "Marquis," "was being real disrespectful." At Wise's request, Jada went to a telephone booth and called the police.

Marquis began to argue with one of the appellant's friends. Wise asked Marquis and his friends to leave, but they would not. She then asked all the men to leave, and they left the apartment, but stayed on the street outside and continued to argue. Wise locked the door. As she did so, she looked out the window and saw first a white car and then a dark car pull up. Three men got out of each car. The appellant was one of the men. At that time, Finch was standing in front of the steps to Wise's apartment. The appellant approached Finch and stood in front of him. Someone went to the white car, retrieved a silver revolver, and handed it to the appellant. The appellant then shot Finch in the head.

On cross-examination, Wise admitted that when she was initially interviewed by the police after the shooting, and on a

second occasion when she was interviewed by the police, she told them that she had not seen the shooting, and had not mentioned anything about the appellant.

Lakala McCloud also testified at the appellant's first trial, and her testimony also was videotaped. McCloud essentially corroborated Wise's testimony about the party. She stated, however, that she did not know whether the appellant was one of the men who left Wise's apartment before Finch and his friends arrived and could not say whether the appellant was the man whom Marquis was arguing with. McCloud testified that one car, not two, pulled up in front of Wise's apartment before the shooting. She identified the appellant as the man who exited the car and shot Finch in the head. She testified that she thought the gun the appellant used was black.

On cross-examination, McCloud admitted that when she spoke to the police after the shooting, and again at a second interview, she told them that Finch had been trying to make peace before he was shot. She further admitted that she had told the police that she was inside when she heard a shot, and that when she went back outside, Finch was lying on the ground and whoever had shot him was gone. She admitted having told the police she did not know who shot Finch. She explained, however, that her first two statements to the police had been tape-recorded, and after she gave the second statement, she told the police she did not want to be taped anymore. After the police turned the tape recorder off, they told her they knew she was lying and asked if she wanted to tell the truth. They also told her she could go to jail if she did not tell the truth. She then told the police that she had witnessed the shooting.

On redirect examination, McCloud testified that, after she told the police she had seen the shooting, she identified a picture of the appellant as that of the shooter.

The videotapes of Wise's and McCloud's testimony at the appellant's first trial were played for the jury at the appellant's second trial. Also at the appellant's second trial, Baltimore City Police Officer Charles Craig testified that shortly

after midnight on April 30, 1999, he was called to 110 South Monroe Street. When he arrived, he saw an unconscious black male, later identified as Carlton Finch, lying on the sidewalk, with an apparent gunshot wound to the head. Finch was still breathing when Officer Craig arrived. The officer radioed for a medic and for backup.

Finch was transported to the Shock Trauma Unit of the University of Maryland Hospital, where he was pronounced dead. The cause of death was a gunshot wound to the head.

## DISCUSSION

At the appellant's first trial, in addition to Wise and McCloud, the State called as witnesses Willis and Benn.

The appellant's retrial was set for February 4, 2000, but was postponed because defense counsel was unavailable until April. A new trial date of May 30, 2000, was set, but the case again was postponed, this time because the prosecutor was unavailable.

The retrial was rescheduled for September 5, 2000. On that date, the prosecutor assigned to the case asked the trial judge for a postponement. He explained that he had been assigned to the case in late June or early July and had been unable to locate the witnesses, all of whom had moved. He had subpoenaed the witnesses, but their addresses either were found to be vacant houses or the subpoenaes had to be left in mailboxes. Because the witnesses "[had] been seen, according to the district officers," there had "been an effort since early to mid-August [to] attempt[ ] to try to locate" them, without success. The trial court refused to grant a continuance, but sent the prosecutor to the administrative judge. Apparently, the administrative judge denied the request as well.

On Thursday, September 7th, the prosecutor asked the trial court to permit him to put into evidence the transcripts or videotapes of the witnesses' testimony from the appellant's first trial. The prosecutor explained that he had met with two of the witnesses the previous day, and they had agreed to

meet Detective McGrath and attend trial that morning. They had failed to show up as agreed, however.

Detective McGrath testified before the court about the efforts that had been made to locate the four witnesses. He explained that, even though the witnesses had appeared and testified at the appellant's first trial, they had been "[v]ery reluctant" to do so because they were afraid. They had been granted witness protection. After the first trial ended, he had had contact only with Katina Wise, who telephoned him periodically. When she telephoned him, she would express her concerns and inquire about a retrial. The last time Wise called Detective McGrath had been in late July. Around the second or third week of August, the detective telephoned Wise at a number she had given him, only to find the telephone had been disconnected. Detective McGrath checked to see whether Wise had been arrested and checked with the Department of Parole and Probation to see if she was on probation. These inquiries yielded nothing. The last known address for Wise with the Department of Motor Vehicles was 451 Withridge Avenue. Detective McGrath went to that address, but could not get a response at the door. He looked inside and saw that the premises appeared to be unoccupied.

Detective McGrath attempted to get other Baltimore City Police Officers to look for the witnesses; the time frame in which those efforts took place was unclear. The detective "concentrat[ed] mainly on the Western and Southern Districts" of the city. He contacted the Special Enforcement Unit in the Southern District, which helps in locating witnesses. He spoke to an Officer Hardesty from that unit, and sent him photographs of Wise and McCloud. He was unable to get photographs of Benn and Willis because Benn had no arrest record and Willis was a juvenile.

On Tuesday, September 5, Detective McGrath was driving on Monroe Street when he saw Lakala McCloud. He pulled over and spoke to her. While they were speaking, Katina Wise walked up to them and joined in the conversation. Detective McGrath made arrangements to meet the two wom-

en the next day, September 6, at the corner of Fulton Avenue and Fayette Street. That meeting occurred, and Detective McGrath took the women to the Southern District Police Station. He served them with subpoenaes, which they accepted. The women agreed to meet Detective McGrath the next morning, September 7, for him to take them to the courthouse to testify. When Detective McGrath went to meet the women that morning, they did not show up.

During the conversation with the women on September 5, Wise gave Detective McGrath the address of 451 Withridge Avenue. When the detective commented that he had been to that address and it appeared to be vacant, Wise said she had had difficulties with the Witness Protection Program, and she was in the process of moving in with a relative at 328 South Monroe Street. During the same conversation, McCloud would not give the detective an address, but indicated that Wise knew how to contact her.

On September 7, when Wise and McCloud failed to meet him as they agreed, Detective McGrath drove around for a while, hoping to spot the women walking toward the appointed meeting place. He then returned to that location and showed Wise's photograph to people on the street. One woman told him she knew Katina Wise and thought she had a relative living in the 300 block of South Monroe Street. Detective McGrath went to the 300 block of South Monroe Street and showed people standing outside 326 South Monroe Street pictures of Wise and McCloud, and asked whether they knew either of them. The people said that they did not. He then went to 328 South Monroe Street and spoke to the residents of the first floor. They said they thought someone on the second floor might know the women. Detective McGrath knocked on the door of the second floor apartment, but there was no response. He then went to the apartment next door, at 330 South Monroe, but the people there did not know either of the women.

Detective McGrath also made the following efforts to find Willis. He telephoned a number that Willis had given him and

spoke to a woman who identified herself as Willis's cousin. The woman said that Willis had moved, and she did not know where to, though she thought Willis was living in the area of North and Braddish Avenues. Detective McGrath tried to get the address of the woman he spoke to, but her number was unpublished and he could not get an address from it. He drove through the area of North and Braddish Avenues but could not locate Willis on the street.

Detective McGrath explained that he had not expected to have trouble finding Willis, who was sixteen years old. He had thought Willis was still enrolled in school in Baltimore City. When he telephoned the school police, however, he learned that Willis was not attending any public school in Baltimore City.

On cross-examination by defense counsel, Detective McGrath conceded that when he had spoken with McCloud and Wise on September 5, he had not tried to hold them or to get body attachments for them. He testified that he had had no legal basis to hold the women that day. Defense counsel argued, to the contrary, that the prosecutor could have requested body attachments for Wise and McCloud, and if the body attachments had been issued, "the entire Baltimore City Police Department, rather than simply one detective, essentially, would presumably [have been] looking for these people."

The trial court noted that summonses had been issued, "so [Detective McGrath] had summons processors that were part of this effort. The detective also indicated that he contacted two districts, so, therefore, you could assume that two districts were somewhat involved with this effort." Defense counsel pointed out that there was no evidence before the court about what efforts, if any, other officers had made to secure the testimony of the witnesses. He argued that it should have been clear that the witnesses were not cooperative, and that the prosecutor should have asked for body attachments after he interviewed the women.

The trial court found that the State had made reasonable efforts to procure the witnesses, to no avail, and on that basis

permitted the State to introduce into evidence Wise's and McCloud's videotaped testimony, pursuant to Maryland Rule 5–804(a)(5).

On appeal, the appellant contends the trial court's ruling was in error. He argues that the State failed to meet its burden to prove the witnesses were unavailable, under Md. Rule 5 804(a)(5), and that the introduction into evidence of the witnesses' videotaped testimony violated his Sixth Amendment right of confrontation.

Maryland Rule 5–804 provides, in pertinent part:

**Hearsay exceptions; declarant unavailable.**

 (a) Definition of unavailability. "Unavailability as a witness" includes situations in which the declarant:

* * *

(5) is absent from the hearing and the proponent of the statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subsection (b)(2), (3), or (4) of this Rule, the declarant's attendance or testimony) by process or other reasonable means.

A statement will not qualify under section (b) of this Rule if the unavailability is due to the procurement or wrongdoing of the proponent of the statement for the purpose of preventing the witness from attending or testifying.

 (b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) Former testimony. Testimony given as a witness in any action or proceeding or in a deposition taken in compliance with law in the course of any action or proceeding, if the party against whom the testimony is now offered, ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

■ "In all criminal prosecutions in the State of Maryland, the Sixth Amendment to the Constitution of the United States

... and Article 21 of the Maryland Declaration of Rights command that the accused shall enjoy the right to be confronted with the witnesses against the accused." *State v. Breeden,* 333 Md. 212, 218–19, 634 A.2d 464 (1993).

> [T]he confrontation clause encompasses more than a mere opportunity for effective cross-examination. It compels a witness to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*Id.* at 219, 634 A.2d 464 (quoting *Mattox v. United States,* 156 U.S. 237, 242–43, 15 S.Ct. 337, 39 L.Ed. 409 (1895), quoted in *Ohio v. Roberts,* 448 U.S. 56, 63–64, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)).

 However,

there has traditionally been an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant.

*State v. Breeden, supra,* 333 Md. at 220, 634 A.2d 464 (quoting *Barber v. Page,* 390 U.S. 719, 722, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968)). Culling from *Barber v. Page, supra,* and from *Ohio v. Roberts, supra,* the *Breeden* Court concluded:

> In a nutshell, the "unavailability" of a material witness includes one who is absent from a trial and the proponent of the statement of the witness has been unable to procure the witness's attendance by process or other reasonable means. "Other reasonable means" require efforts in good faith and due diligence to procure attendance.

*State v. Breeden,* 333 Md. at 222, 634 A.2d 464. The determination of whether a witness is "unavailable" within the meaning of the rule is within the discretion of the trial court, and we review the trial court's decision under an abuse of discretion standard. *Id.* at 215–16, 634 A.2d 464. The burden of establishing good faith and due diligence is on the prosecution. *Ohio v. Roberts, supra,* 448 U.S. 56, 74–75, 100 S.Ct. 2531, 65

L.Ed.2d 597 (1980); *State v. Breeden*, 333 Md. at 221, 634 A.2d 464.

The appellant argues that two factors warrant a finding on appeal that the trial court abused its discretion in concluding that Wise and McCloud were "unavailable" and that the State had acted in good faith and with due diligence. First, the State delayed in arranging for a retrial, resulting in a nine-month hiatus between the end of the first trial and the retrial. Citing Maryland Rule 4–271 and *State v. Hicks*, 285 Md. 310, 403 A.2d 356 (1979), and its progeny, as establishing that six months is a sufficient time for a first trial, the appellant maintains that "this *retrial* required no additional preparation time," and the nine-month hiatus was an "inordinate" delay.

The State responds that this argument was waived because it was not made in the trial court, and that it is without merit. We agree with the State on both points. An appellate court ordinarily will not decide any issue not raised in or decided by the trial court. *Ware v. State*, 360 Md. 650, 692, 759 A.2d 764 (2000), *cert. denied*, 531 U.S. 1115, 121 S.Ct. 864, 148 L.Ed.2d 776 (2001); Maryland Rule 8–131(a). The appellant did not argue before the trial court that the State waited too long to retry him. In any event, the record establishes that the retrial would have taken place in February, two months after the appellant's first trial, but defense counsel was unavailable and requested a postponement, which was granted. Thus, the State did not wait nine months to reschedule the trial. The record also reflects that the trial was postponed again because the prosecutor at the first trial had left the State's Attorney's Office and the case had to be reassigned. It was not unfair to the appellant to give the new prosecutor time to prepare for trial.

The second factor the appellant cites in arguing that the trial court abused its discretion in ruling that the State acted in good faith and with due diligence to secure Wise's and McCloud's testimony is that when Detective McGrath located Wise and McCloud, he did not offer them witness protection status, did not establish addresses and telephone numbers for

them, and did not attempt to hold them as material witnesses under Rule 4-267(a).

Maryland Rule 4-267 provides, in pertinent part,

Body attachment of material witness.

(a) Without order of court. When a peace officer takes a person into custody as a material witness without an order of court for attachment, the person shall be taken promptly before a judicial officer in the county in which the action is pending or where the witness is taken into custody. If the judicial officer determines, after a hearing, that (1) the testimony of the witness is material in a criminal proceeding, and (2) it may become impracticable to secure the witness' attendance by subpoena, the judicial officer shall set a reasonable bond to ensure the attendance of the witness at the hearing or trial when required. A witness who is unable to post the prescribed bond shall be committed to jail. After seven days a detained witness shall be released unless, prior thereto, the court, after hearing, orders further detention pursuant to an application filed in accordance with this Rule.

\* \* \*

(c) Deposition of witness in custody. The court may order that the testimony of a material witness who is in custody be taken by deposition and may release the witness after its completion.

The appellant did not argue before the trial court that the witnesses should have been offered witness protection status. Moreover, Detective McGrath's testimony that Wise had been in the program but had had problems with it made it clear that offering the women witness protection status would have accomplished little.

In making its ruling, the trial court took into consideration that Detective McGrath did not hold Wise and McCloud as material witnesses and concluded that that action was not required under the circumstances—and that its absence therefore was not indicative of lack of due diligence or bad faith.

On the evidence presented, the trial court's conclusion was not an abuse of discretion. Although the State had been unable to locate Wise and McCloud previously, there was nothing to suggest that the women had been avoiding the police. Indeed, the evidence was that the witnesses had been seen by district officers. After Detective McGrath found Wise and McCloud, the women agreed to meet with him on September 6, and did so. They were served with subpoenaes and agreed to testify. Thus, both women gave every indication of cooperating with the police. Also, they had previously testified in the case, and therefore had a history of having cooperated. Detective McGrath, who knew the women and had dealt with them previously, apparently believed that they would meet him as they had agreed to do.[2]

We have found few cases addressing whether the State's failure to incarcerate a material witness pending his testimony constituted a lack of due diligence on the State's part so as to make a finding that the witness was unavailable an abuse of discretion. In *People v. Baldwin*, 74 Mich.App. 700, 902, 254 N.W.2d 619, 621 (1977), *reversed on other grounds*, 405 Mich. 550, 275 N.W.2d 253 (1979), Baldwin contended that the trial court abused its discretion in ruling that the State could introduce into evidence testimony by a witness at Baldwin's preliminary hearing. The State had had trouble locating the witness. A few days before trial, the witness was arrested on an unrelated charge, and was served with a subpoena. The witness explained that she had been out of town, and agreed to appear to testify at the trial. The Michigan Court of Appeals rejected Baldwin's contention, stating that there was no reason to believe the witness had been intentionally avoid-

---

2. It is unclear whether the women were cooperative on Wednesday, September 6th when they met with the prosecutor. On September 8th, the prosecutor told the trial court, "the witnesses were cooperative once the police officer found them and weren't cooperative with me on Wednesday," but immediately afterward said, "I'm absolutely convinced that sometime between when I saw them Wednesday afternoon to Thursday morning something happened to change their mind and they no longer became cooperative."

ing service or she had not wanted to testify at his trial. *Id.* at 705–06, 254 N.W.2d at 622.

The California Court of Appeals rejected a similar contention in *People v. O'Shaughnessy*, 135 Cal.App. 104, 26 P.2d 847 (1933). The court there stated, "The record contains no evidence, and none was offered, of any facts that would have justified such an arrest and detention. It appears that this witness was present and testified at the preliminary hearing; that the district attorney was informed and believed that she was present in the city and intended to be and would be present as a witness at the trial." *Id.* at 108–09, 26 P.2d at 849.

In *State v. Reid*, 114 Ariz. 16, 559 P.2d 136 (1976), *cert. denied*, 431 U.S. 921, 97 S.Ct. 2191, 53 L.Ed.2d 234 (1977), the Arizona Supreme Court rejected the defendant's contention that the State had not established a good faith effort to secure three witnesses's attendance at his trial because it had not required the witnesses to post bonds. The court explained:

> The practical effect of invoking the [material witness] statute, then, would quite likely have been the incarceration of the three witnesses. *A.R.S.* § 13–1843. Confinement of a witness, even for a few days, not charged with a crime, is a harsh and oppressive measure which we believe is justified only in the most extreme circumstances. We note also that under *A.R.S.* § 13–1843(B) and (C), a material witness can be detained for a maximum of three days, and that during those three days the witness may be "conditionally examined" on application of either party. Testimony given on conditional examination
>
> > " * * * may be admitted in evidence at the trial under the same conditions and for the same purpose as the testimony of a defendant or witness testifying at a preliminary hearing." *A.R.S.* § 13–1843(B).

114 Ariz. at 22–23, 559 P.2d at 145.

Both the Fourth Circuit and the Tenth Circuit Courts of Appeals have considered whether the United States government was required to detain material witnesses for trial

pursuant to 18 U.S.C.S. § 3144, which permits such detention if it is shown that it may become impracticable to secure the presence of the person by subpoena. That statute also provides that no material witness may be denied release if the testimony of such witness can adequately be secured by deposition, and if further detention is not necessary to prevent a failure of justice.

In *United States v. Rivera*, 859 F.2d 1204 (4th Cir.1988), *cert. denied*, 490 U.S. 1020, 109 S.Ct. 1743, 104 L.Ed.2d 180 (1989), the Fourth Circuit held that the trial court had not erred in declaring three illegal aliens who had been deported by the United States to be unavailable within the meaning of Rule 804(a) of the Federal Rules of Evidence. The government had used a deposition of one of the aliens and parts of two other depositions at Rivera's trial. Rivera argued that the witnesses were not unavailable because the government, by its own actions, had deported them. The Court of Appeals noted that, actually, the witnesses had left the United States voluntarily, and the court had acted appropriately in permitting them to be deposed rather than keeping them in custody. *Id.* at 1207. The Court of Appeals further noted that the United States Attorney had a duty to consider the rights of the witnesses as well as those of appellant. *Id.*

Similarly, in *United States v. Eufracio–Torres*, 890 F.2d 266 (10th Cir.1989), *cert. denied*, 494 U.S. 1008, 110 S.Ct. 1306, 108 L.Ed.2d 482 (1990), the Tenth Circuit held that the trial court had not erred in permitting the use of depositions given by seven witnesses who had been released and permitted to leave the United States after they had been deposed. The Court explained:

> The witnesses were requested to return and instructed how to return and how to obtain the necessary monies to return. They promised to return, but failed to do so. The law does not require the government to utilize an absolute means of attempting to assure the appearance of a witness, only a reasonable means. The facts of this case establish the government utilized reasonable means to assure the attendance of the witnesses. The fact that the means utilized

were unsuccessful does not mean that the governments efforts were not made in good faith.

*Id.* at 270.

We agree that incarcerating witnesses should be done only when absolutely necessary. In the present case, the women had appeared on September 6, as promised, and Detective McGrath believed their assurances that they would appear the next day. It is true that, had the witnesses been detained, it only would have been for a few days, until their testimony. Yet, they previously had appeared in court when required, they were under subpoena, and they had promised to return for trial. It is neither surprising nor reprehensible that the State was reluctant to incarcerate witnesses who had expressed a willingness, albeit reluctantly, to testify. Furthermore, the Maryland statute also provides for the taking of a witness's deposition. In the present case, the witnesses had already testified at a prior proceeding. While the existence of prior testimony would not excuse the State from using due diligence to obtain the presence of the witnesses, that depositions may be taken suggests that the use of the statute to incarcerate witnesses should be even more sparing when prior testimony exists.

Under the circumstances, the trial court did not abuse its discretion in concluding that the witnesses were "unavailable," and that their prior testimony therefore could be put into evidence.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**