10 A.3d 798

**Gary James SMITH**

v.

**STATE of Maryland.**

**No. 1178, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Dec. 28, 2010.

496

502

Gary E. Bair (Erica J. Suter, Bennett & Bair, LLC, on the brief) Greenbelt, MD, for appellant.

James E. Williams (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: EYLER, JAMES R., MATRICCIANI, and RAYMOND G. THIEME, JR. (Retired Specially Assigned), JJ.

RAYMOND G. THIEME, JR. (Retired Specially Assigned), J.

Appellant, Gary James Smith, was indicted in the Circuit Court for Montgomery County, Maryland, and charged with the murder of Michael McQueen and use of a handgun in the

commission of a felony. Following a twelve-day jury trial, appellant was convicted of second-degree depraved heart murder and use of a handgun in the commission of a felony. Appellant was sentenced to 30 years for second-degree depraved heart murder, to be followed by a consecutive sentence of 20 years for use of a handgun, with 15 years of that latter sentence suspended, followed by five years supervised probation upon release. Appellant timely appealed and presents the following seven questions for our consideration:

1. Where suicide versus homicide was at issue, did the trial court err in refusing to admit evidence of the decedent's state of mind?

2. Did the trial court err in giving the jury a voluntary intoxication instruction, an affirmative defense, that was not generated by the evidence and was not asserted by the defense at trial?

3. Did the trial court err in admitting the hearsay statement of Michael McQueen that "Gary is not right in the head" as relevant for purposes of establishing motive?

4. Did the trial court err in refusing to allow the defense to question the State's expert about prior cases for bias and prior inconsistent statements?

5. Did the trial court err in permitting the improper rebuttal expert testimony of Dr. Jonathan Arden?

6. Did the trial court err in not granting a mistrial when the prosecution improperly commented on sentencing during rebuttal argument to the jury?

7. Did the trial court abuse its discretion by repeatedly questioning State and defense witnesses in a manner which appeared to support the State's theory of the case, thereby depriving Appellant of his right to a fair and impartial trial?

For the following reasons, we shall affirm.

## BACKGROUND

Michael McQueen died of a contact gunshot wound to the head in the early morning hours of September 26, 2006. His roommate, Gary Smith, the appellant, was the only one present at the time of the shooting. Appellant and McQueen had

been roommates for about three weeks prior to the shooting. Both had served as U.S. Army Rangers and had been deployed several times together in Afghanistan.

On the night of September 25, 2006, at around 5:30 p.m. or 6:00 p.m., appellant and McQueen smoked some marijuana in their apartment, had dinner, and drank a couple beers. After that, they went to the VFW post in Gaithersburg, where, over the course of two or three hours, they drank mixed drinks and played pool. After leaving the VFW at 11:00 p.m., McQueen and appellant went to the Village Café, where they stayed between a half hour and an hour, and left without finishing their beers.

When he was interviewed by police during the early morning hours of September 26, 2006, appellant gave police at least three versions of what happened next. According to the testimony of Detective James Drewry, of the Montgomery County Department of Police, in the first version, appellant dropped McQueen off at their apartment, then traveled to his mother's house to pick up clean socks. Appellant returned to the apartment at around 12:30 a.m., found the door unlocked, and called out, "Did you pack that bong again asshole." Appellant found McQueen "sitting half-way on his chair. I tried to take him back up and put him back up on the chair. Because I thought he was drunk at first. Just kind of slumped. But then I saw the blood on the floor, and then I thought maybe he knocked over his beer, and then I knew it was blood. I ran back downstairs and grabbed my phone from the car. Called 9–1–1." Appellant ran back upstairs, touched McQueen's hand and neck to see if he had a pulse, but felt none. Appellant thought it was possible that the blood on his person got there when he checked on McQueen.

While appellant admitted that he owned a .45 caliber pistol, a .9 mm rifle, and an AK47, he indicated that these weapons were stored at his mother's house. McQueen used to own a .9 mm pistol, but that pistol had been sold. Thus, according to appellant's first version, while there may have been loose ammunition in his car on the night in question, there were no guns either in the house or in his car.

Also in this first version of events, appellant gave police information concerning other possible suspects. Appellant informed police that McQueen had a history of arguing with some "Hispanic Mexican" guys who lived in the community. Appellant also indicated that they normally purchased their marijuana from a person named "P.J.", but appellant did not believe P.J. was involved. The marijuana they smoked earlier that night was from a different dealer, an African–American male that drove a beige Jaguar. Appellant also told police that McQueen was in Florida for two weeks prior to the shooting, and that "he must have done something really bad to have someone drive all the way up there and want to kill him. And Mike wouldn't do anything like that."

Later during his interview with Detective Drewry, appellant told a second version of events. In this version, appellant informed police that there was, in fact, a gun in the apartment when he discovered McQueen. Appellant maintained that he dropped McQueen off while he went to his mother's house to pick up his clean laundry. When appellant came home, "Mike was dead. The gun was in his hand. It was a .38. I didn't know if he was playing around with it or what. I got so scared when I found him lying there dead that I took the gun and I threw it away. And I called the cops and I called an ambulance." The gun was appellant's own Smith & Wesson .38 special that he kept under the kitchen counter, a location known both to appellant and McQueen.

Believing that his fingerprints were on the weapon, appellant took the gun and drove to nearby Lake Needwood. He removed the bullets out of the gun, and then threw the gun and the bullets into the lake. Appellant maintained that McQueen's blood got on him when he checked on McQueen and when he put the gun in his pocket. After he disposed of the gun, appellant drove back to the apartment and then called 9–1–1.[1]

---

1. The .38 caliber revolver was eventually recovered from Lake Needwood by a fire and rescue dive team and admitted into evidence.

When asked why he lied in his first version, appellant stated: "I just came home and my friend's fucking dead and he's got a big hole in his head and it's like, how hard would it be for me to, you know, shoot you and put the gun in your hand and then, you know, it's, I was just so scared." Appellant stated it was his "responsibility and it was my fault. I shouldn't have left it there." Although appellant initially denied that McQueen committed suicide, he later told police that McQueen "killed himself." Finally, in this second version, appellant swore that he was not present when the shooting occurred.

Appellant gave a version of events toward the end of his September 26, 2006 interview with Detective Drewry. In this final version, appellant finally admitted he was inside the apartment when the shooting occurred. Appellant stated,

"When I went to my mother's house I put the .38 inside the laundry basket, and when I took it into the house I just put it in my pocket and took it upstairs. I put it on the floor.[2] I was like, you see this one, right, Mike? He goes "Yeah." I said "Okay. Watch out. It's loaded." I went into the back bathroom. I was going number two. I came out and as I was walking out in the hallway I was about inside the room and I heard the bang."

Appellant "saw the blood coming out of [the victim's] head," and stated:

I absolutely went ballistic. I didn't know what to do. I didn't know to call 9–1–1. I didn't know whether to grab him and pick him up. I didn't know whether to throw him in [the] car. I didn't know what to do. And you train for this [in] combat, when your buddy gets shot in combat, you know what to do.

Appellant then decided to dispose of the gun. After returning to the apartment, appellant maintained that he still did not know what to do. Appellant contemplated retrieving

---

2. In yet another version, appellant stated that he put the gun "on the table in the living room, the counter right there."

the gun, or putting another gun in McQueen's hands, but realized the ballistics evidence "won't match up." At that point, appellant finally decided to call 9–1–1, stating: "I knew the longer I waited the more suspicious it would look, so I called 9–1–1."

In addition to these different accounts surrounding the shooting, at some point during his interview with police, appellant told Detective Drewry that he shot a twelve-year-old boy wearing grenades on a vest, as well as the boy's mother, while he was deployed in Iraq. Appellant also told the detective:

> I tried to tell my best friend, I said, I told him I shot a 12–year–old boy and I saw the look on his face when he, that look right there, like if you shot a 12–year–old boy, you're a monster. You know, I told him. He gave me that look and I saw it. He lost so much respect for me when I told him that. And, people don't understand that. People don't understand, even if it was a grown man, that, that catastrophic, the things that go on up here every single day.

In addition, after returning from overseas, appellant sought treatment at Walter Reed Hospital for depression, but was turned away because he was not active Army at the time. Appellant stated: "They told me I had to leave, you can't talk. You try to talk to people and no one ever understands."

Appellant swore that McQueen "killed himself." Appellant surmised that "[m]aybe [McQueen] saw something he didn't like overseas. Maybe his girl broke his heart. Some things are harder to explain than others. Guys like me and Mike, we're supposed to be these big tough killers, we can't let a woman hurt us. You know that." When asked whether McQueen appeared as if there was something "going on that he just couldn't deal with," appellant replied, "[a] little bit. But, I didn't, I don't know. I never saw him, I don't know what would make him do it." After completing his statement, appellant assisted the police in recovering the gun from Lake Needwood.

Officers from the Gaithersburg Police Department and the Montgomery County Police responded to the scene at around 1:00 a.m. following the 9–1–1 dispatch. Appellant was outside the apartment building on his knees crying hysterically, vomiting, and repeatedly yelling, "He's dead. He's dead." Appellant had a considerable amount of blood on his hands, face, shirt, and shoes. The parties would later stipulate that appellant's undershirt, tennis shoes, jeans, and t-shirt all tested positive for the presence of blood DNA from McQueen, and negative for blood DNA from appellant. DNA swabbed from appellant's left palm and chin contained a combination of McQueen's blood DNA, and appellant's non-blood DNA. The swab from appellant's cheek and neck tested positive for McQueen's DNA.

After obtaining a search warrant at around 2:22 a.m., forensics specialist Kimberly Clements processed the crime scene and took photographs of the blood spatter on the carpet and surrounding area. A portion of the carpet containing blood spatter was cut out and recovered. Blood was found on a door handle, and bloody footprints were found in the hallway near the rear bedroom.

There was drug paraphernalia in McQueen's lap, next to his left hand. McQueen's right arm was dangling down with his hand on the floor next to a beer bottle, a ceramic pipe, and a bong. The latter two items tested positive for marijuana and marijuana residue. There was also a remote control under McQueen's right hand and one of two televisions in the room was turned on.

Clements also recovered a gun locking cable from the living room area. Clements testified that the "cable is intended to go through the gun chamber and lock so the gun cannot be fired loaded or fired accidentally." A second gun locking cable, as well as a bag containing ammunition, were recovered from a rear bedroom. Another forensic specialist, Grant Lee, processed appellant's car and recovered "three rifle magazines, a pistol magazine, 12 gauge shotgun round, two live 7.62

rounds, a box of 22 ammunition and one live .38 round" from the driver's side front door pocket.

Gunshot residue ("GSR") samples were taken from both appellant's and McQueen's hands. The State's GSR expert testified that the hands of both appellant and McQueen tested positive and there were more particles on McQueen's hands than on appellant's. After explaining that "particles would remain on the hands until the time of collection unless it were handled or moved around," the expert opined that, given the approximately 40 to 45 minutes between the time of the incident and the collection of the residue from appellant, "there was ample opportunity for the cause of particle loss." The GSR expert could not conclude who the shooter was based on his analysis.

A suspected projectile or portion of a bullet, as well as copper fragments from a bullet jacket, were collected during McQueen's autopsy. A firearms expert examined these items, as well as the .38 revolver recovered from Lake Needwood. While the bullet fragments recovered from McQueen were consistent with having been fired from a similar firearm, the expert could not conclude that the fragments actually were fired from the .38 revolver recovered in this case.

Dr. Carol Allan, the State's forensic pathologist who conducted McQueen's autopsy, testified that McQueen sustained a "very severe" contact gunshot wound to the right side of the head. The path of the wound was right to left, and very slightly front to back. Dr. Allan also testified that McQueen had a blood alcohol level of somewhere between .13 and .20.

As noted, the cause of death in this case was a gunshot wound to the head. Dr. Allan then addressed the manner of death, noting that Maryland recognizes five manners of death, including: natural; accident; suicide or self-inflicted; homicide, and undetermined. Dr. Allan concluded that, to a reasonable degree of medical certainty, the manner of death in this case was homicide.

Dr. Allan based her conclusion on the circumstances surrounding McQueen's death, including that there was no blowback, soot or blood spatter on McQueen's right hand or

forearm; the gunshot residue on McQueen's hands did not display a specific pattern indicating that he was holding a gun; there was no gun found at the scene of the shooting; and, there was no evidence on the carpet below McQueen's right hand that a gun had been dropped. In fact, Dr. Allan noted that "the thing that was in the ideal positioning for being in the right hand was, actually, a TV remote."

Dr. Allan also based her conclusion on the fact that the reporting individual, appellant, had a number of versions of how events unfolded; these versions were not adequately explained by the blood spatter evidence; there was no indication that McQueen was known to act impulsively or in a risk-taking manner while either intoxicated or sober; there was no evidence that McQueen was suicidal or otherwise depressed; and, there was no indication that McQueen could not obtain a gun earlier, if he wanted to commit suicide. Finally, Dr. Allan agreed that although she reviewed reports from other experts involved in this case, those reports did not lead her to change her conclusion that the manner of death was homicide.

Several other experts testified at trial. Dr. William Vosburgh, the State's expert in the field of blood stain pattern analysis and interpretation, identified two areas on the carpeting that were of particular importance in this case. One was a "v" shaped void in the blood stain pattern. Vosburgh was of the opinion that this void was caused by an "intervening object being [there] for some period of time during maximum blood pressure." Vosburgh believed that the intervening object was appellant's right shoe. The other area of interest was another void caused by "a hand that [was] in the way at that moment getting blood cast upon it, and a spray of blood going between the [fingers]."

Dr. Vosburgh also was aware that appellant claimed that he touched the wound to attempt to stop the bleeding, but there was no evidence of any imprint or indication that the wound was touched or moved after the shot was fired. On cross-examination, Dr. Vosburgh agreed that his preliminary assessment was that the contact gunshot wound to the victim's head was not self-inflicted.

In contrast to Dr. Vosburgh's opinions, Herbert MacDonnell and Barton Epstein testified as defense experts in blood stain pattern analysis and interpretation. Both experts were of the opinion that the "v" shaped void pattern on the carpet could not have been made by appellant's sneaker because the void was "v" shaped, while the sneaker was rounded and would have left a void in a similar shape.

Further, Professor MacDonnell testified that there was not enough blood on the sneaker to account for the amount of blood visible on the stain in the carpet. It was his opinion that the blood on appellant's sneaker was caused when the sneaker "came into contact with something that was bloody." Mr. Epstein agreed that, at some point, appellant's pants and shoes "were underneath the dripping blood of McQueen," but it was unclear when or where that occurred. However, appellant's pants and shoes only needed to be under the source of blood for "a very short time, meaning a second or less," to have resulted in the stains.

Both defense experts examined the rug and found a left handprint, which they concluded was not a void caused by a hand being on the carpet at the time of the initial bleeding, but rather, was made by blood being transferred from a bloody palm onto the rug. Both experts also disagreed with Dr. Vosburgh's opinion that this stain was caused by a spray or mist of blood going between the fingers because, as Professor MacDonnell testified, there was "just too much blood for a mist or a spattered blood from impact to do that."[3]

Professor MacDonnell was also of the opinion that the pattern of the blood stains and the presence of tissue on McQueen's right arm indicated that McQueen's arm was upright, above shoulder height at the moment of impact.[4] Mac-

---

**3.** One of the police witnesses testified that appellant had blood on his left palm, with "a little bit on the back of the left hand, but almost nothing on the right hand."

**4.** Dr. Vosburgh testified that he was unable to determine from the pattern whether McQueen's arm was up or down at the time of the gunshot.

Donnell explained that the initial stain on the arm was "from right to left and then eventually running down by gravity." Professor MacDonnell also concluded that McQueen's head was upright at the time the wound was sustained. Therefore, MacDonnell explained that "in my opinion the arm would have to have been up in this position, up above the shoulder." The defense's other expert, Mr. Epstein, agreed that the victim's head was upright at the time of the shooting, but was unable to determine whether McQueen's arm was up or down.

Dr. Vincent Di Maio also testified for the defense as an expert in forensic pathology. After reviewing the autopsy report and other evidence, he concluded that McQueen died "as the result of a self-inflicted gunshot wound; that this case is a suicide." Dr. Di Maio observed that the contact wound was to McQueen's right temple, the most common area for self-inflicted wounds, noting that contact wounds appear in 97.9 percent of such cases. He also indicated that the gun appeared to have been held at an angle considered normal when someone puts a gun to his own head. Dr. Di Maio also based his conclusion on the fact that there was a "tremendous amount" of gunshot residue on McQueen's hands; McQueen had at least a .13 blood alcohol level; that there was "an alleged history of depression or separation;" there was no evidence of a struggle; and, that "there doesn't seem to be any motive for it to be a homicide." He concluded his direct examination by testifying: "I don't doubt it's a suicide." [5]

In addition to the various investigators and experts, both parties called other witnesses to testify regarding their observations of McQueen and appellant. McQueen and appellant were good friends, and, according to appellant's statement,

---

5. On cross-examination, Dr. Di Maio agreed he learned about McQueen's alleged history of depression from a psychiatric evaluation that was sent to him, but he did not know that that history was based on information solely provided by appellant and appellant's mother. Dr. Di Maio also agreed he did not speak to any of the witnesses in this case and based his opinion on the autopsy, the photographs, physical evidence, appellant's statements, the police reports, and various expert reports.

best friends. No one testified to any conflict between the two, especially on the night of the incident. However, Ronnie McKay did testify that McQueen told him he did not want to live with appellant, "[b]ecause he said, you know, Gary is not right in the head."

McQueen's former girlfriend, Shaieyann Williams, testified that McQueen broke up with her sometime before the summer of 2006, but the break-up was a mutual understanding and that, afterwards, they continued to remain friends. McQueen did not seem depressed from his experience in the military, and seemed happy to end that career and to move forward with his plans to go to college.

McQueen's friend and former fellow Ranger, Justin Jones, testified that he and McQueen were deployed together in Afghanistan, where McQueen was an intelligence analyst. According to Jones, McQueen spent most of his time at a central base location. After returning to the United States, Jones confirmed that McQueen was excited to leave the military and go on to college.[6]

While McQueen was visiting Jones in North Carolina, McQueen became romantically involved with Tina Warner. On or around September 8, 2006, McQueen told Jones that he thought Warner might be pregnant, but that concern ultimately turned out to be unfounded. Jones also testified that McQueen told him about being arrested for "a DUI in Atlanta" over that summer, but that McQueen "was pretty calm about it," and acted as if it were "[n]o big deal."[7]

Rosemary Smith, appellant's mother, testified that she knew McQueen, and that she had seen McQueen handling her .38

---

6. William Ryan, a Chief Warrant Officer and Intelligence Analyst in the Army, testified that he knew McQueen from the Army, and that McQueen was excited about the possibility of getting out of the Army and attending college.

7. While the witnesses and the parties used the terms "DUI" and "DWI" interchangeably throughout trial, we note that the Georgia Code refers to the pertinent offense as "Driving under the influence of alcohol, drugs, or other intoxicating substances." Ga.Code Ann. § 40–6–391 (2010).

revolver. On some occasion, Smith let McQueen borrow the gun and take it to a shooting range. Smith claimed that McQueen told her that he was not ready to go to college; he wanted to get a job; and, that he was still having difficulty with the break up with Shaieyann Williams. McQueen also smoked and drank a lot while he was in her presence.

Finally, there was a significant amount of testimony concerning appellant's deployments overseas and his experience in the Rangers. Notably, Teru Hayashi, appellant's direct line supervisor in Iraq, testified that, on one occasion, while he was travelling in a Humvee with appellant, appellant left his loaded M–4 rifle, set to the fire position, in an unsafe position inside the vehicle. The loaded M–4 rifle was pointed at the driver of the Humvee.

On another occasion back in the United States, Ian Sutherland, a fellow Ranger, attended a barbecue at appellant's home. During that party, appellant sat down next to Sutherland on the couch and began loading an automatic pistol with .9 millimeter hollow point ammunition while the barrel of the pistol was pointed at Sutherland's leg. Sutherland gestured for appellant to "pay attention" to what he was doing and both of the men then moved away.

Sutherland also testified that he had been deployed with appellant in Afghanistan, and that, based on his experience, he was of the opinion that appellant was "[l]ess than honest" and would embellish the truth and tell "mixed stories." William Ryan, a Chief Warrant Officer and Intelligence Analyst in the Army, knew appellant while they were stationed together at Fort Benning, Georgia. In that community, appellant had a reputation for telling tales and was known to lie.

We shall include additional facts in the following discussion.

## DISCUSSION

### I.

Appellant first contends the trial court erred in not admitting evidence of McQueen's state of mind, stating that "the

trial court refused to permit testimonial evidence of the decedent's statements to a police officer after he had been arrested for a DWI a mere month-and-half before his death, which was critical to Appellant's theory of defense." The State responds that the trial court properly exercised its discretion and that any error was harmless beyond a reasonable doubt. We conclude that the trial court neither erred nor abused its discretion. Moreover, any error was harmless beyond a reasonable doubt.

Towards the end of Justin Jones's testimony, the State inquired if defense counsel intended to call Officer John Hegger, of the Acworth City Police Department in Georgia, concerning McQueen's prior arrest for driving while intoxicated. Defense counsel indicated that was his intention, and proffered that, during that arrest, McQueen told the officer: "I saw a lot of bad stuff over there," and "this is the last thing I need on top of all the other shit, or all the other stuff, bad stuff going on in my life." The court questioned the relevance of the statements, noting at one point that the arrest occurred one month prior to the shooting. Defense counsel maintained that the statements went to the victim's state of mind. After counsel directed the court's attention to *Case v. State*, 118 Md.App. 279, 702 A.2d 777 (1997), the court agreed that evidence of the victim's state of mind may be "consequential," but that "I'm not going to let you go back into infinity and come up with some comment that a person made in a set of circumstances that standing alone are traumatic."

After further discussion, and after the parties unsuccessfully attempted to contact the police officer from Georgia, the State recalled Justin Jones to the stand. Jones informed the jury that McQueen had been arrested for a DUI in Atlanta about a month before he died, and that "he didn't really care too much about it." Further, "any given night at Ranger Regiment any of us could have gotten a DUI for drinking and driving. It just so happened that he got it, you know." McQueen was "pretty calm about it," and that it was "[n]o big deal."

The next day, during a break in Detective Drewry's testimony about appellant's statement, defense counsel returned to this issue, contending that, based on out-of-state authorities, a suicidal testimony may be shown where "death may have been produced by the deceased or there is not positive and direct proof of homicide." Defense counsel agreed there were no Maryland cases on point.

The State responded that it had spoken to Officer Hegger, and that McQueen's case was a "stereotypical DUI, DWI arrest, swerving and all that," and that, while they were "waiting around for 20 minutes for the intox machine to get working or whatever you got to do, and one statement he says is, 'This is the last thing I need in my life.'" The State argued that such a statement under such circumstances "doesn't make it signs of suicide in any way whatsoever." Further, "[i]t's a statement any person would make after a DWI."

After hearing further argument, the court specifically considered *Robinson v. State,* 66 Md.App. 246, 503 A.2d 725, *cert. denied,* 306 Md. 289, 508 A.2d 489 (1986), and concluded that the proffered evidence was inadmissible. The trial court found that McQueen's statement to the Georgia police officer was "very remote. It's 30 days ago before the incident." The trial court ruled that the statements were neither relevant nor trustworthy evidence of McQueen's state of mind, stating:

Being placed under arrest and charged with an offense of DUI or, quite frankly, being placed under arrest and charged with anything, I think it's a reasonable inference that that in itself is traumatic, let alone what else might be going on in an individual's life. And to suggest that a person's reaction to being arrested somehow is indicative of their suicidal thoughts is strained, strains our credulity.

Several trial days later, defense counsel asked the court to reconsider its ruling. Counsel called Officer John Hegger outside the presence of the jury. Although he could not remember the exact date of the stop, Officer Hegger stopped McQueen in early August 2006 on suspicion of driving while impaired by alcohol. After McQueen failed a number of field

sobriety tests, he was placed under arrest, and transported to the police station. There, McQueen asked "if there's anything he could do to get out of this," and Officer Hegger informed him there was not.

While they waited approximately twenty minutes for a breath testing machine to warm up, McQueen appeared depressed, put his hands down on his head, and said "this is the last thing I need in my life right now, on top of all the other, excuse my wording, other shit going on in my life." McQueen also spoke about Iraq and Afghanistan, claiming that he had been shot while overseas. Although McQueen attempted to show Officer Hegger where he was wounded, Officer Hegger did not see any such wound. McQueen then took the breath test, and the test was positive for alcohol in the amount of approximately twice the legal limit in Georgia.

After Officer Hegger was excused, the trial court again ruled that this testimony was remote and not relevant. The court stated: "It won't be helpful at all, that it was a traumatic experience, that I think it's a reasonable, I think I can take a reasonable inference, nobody likes getting arrested for DWI." The court further stated that the fact that "a person would say, I don't want this, can I get out of it, I've got a lot going on in my life," after being arrested under such circumstances, was not relevant to prove that that person committed suicide.

It is ordinarily within the sound discretion of the trial court to determine the admissibility of evidence. *See Sifrit v. State*, 383 Md. 116, 128, 857 A.2d 88 (2004); *Conyers v. State*, 354 Md. 132, 176, 729 A.2d 910, *cert. denied*, 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999); *see also* Md. Rule 5–104(a) (stating the "[p]reliminary questions concerning . . . the admissibility of evidence shall be determined by the court"). Thus, a trial court's evidentiary ruling should not be disturbed absent error or a clear abuse of discretion. *Conyers*, 354 Md. at 176, 729 A.2d 910. Reversal is only required if "the evidence is plainly inadmissible under a specific rule or principle of law or there is a clear showing of an abuse

of discretion." *Merzbacher v. State,* 346 Md. 391, 405, 697 A.2d 432 (1997).

Appellant primarily relies on *Case, supra,* 118 Md.App. 279, 702 A.2d 777. There, Case conceded on appeal that the evidence was sufficient to show that he broke into his former girlfriend's home and "caused her death by shooting her in the head with a handgun he had stolen from his cousin the day before." *Id.* at 282, 702 A.2d 777. Case raised several issues on appeal, including a claim that the court erred in admitting evidence that the victim made statements indicating that she feared Case. *Id.* at 283, 702 A.2d 777. We disagreed, observing that the defense theory was that the victim invited Case to her home and that the gun went off by accident. *Id.* Under these circumstances, we concluded that "the victim's state of mind was of significant consequence to the issue of whether she had invited appellant into her home and had voluntarily positioned herself close enough to him that she would become the victim of an accidental shooting." *Case,* 118 Md.App. at 284, 702 A.2d 777 (citing Maryland Rule 5–401).

█ Appellant seeks to expand the holding of *Case* to instances where the "issue is suicide or homicide." Notwithstanding the distinction that there was no dispute in *Case* that the appellant there was the shooter, we need not decide whether *Case* should be expanded because we agree with the trial court that the evidence was too remote and was not reliable circumstantial evidence of McQueen's state of mind at the time of the shooting.

The trial court based its decision on *Robinson,* 66 Md.App. 246, 503 A.2d 725, and we agree that case is instructive. In that case, the appellant shot the victim on September 3, 1984. *Id.* at 248, 503 A.2d 725. After the State introduced evidence from an owner of a gun shop that the appellant bought a gun on August 4, 1984, the defense sought to elicit whether appellant told the gun shop owner why she bought the gun. *Id.* at 252, 503 A.2d 725. The trial court sustained the State's objections to these questions. *Id.*

On appeal, we considered whether the evidence should have been admitted under the common law "state of mind" exception to the rule against hearsay. *Id.* at 256, 503 A.2d 725.[8] We explained that this exception "embraces two subspecies: 1) a declaration of present mental or emotional state to show a state of mind or emotion in issue, and 2) a declaration of intention offered to show subsequent acts of [the] declarant." *Id.* at 257, 503 A.2d 725.

We then observed that the mental state at issue in *Robinson* was whether the gun was fired accidentally or was fired with a malicious intent. *Id.* The trial court excluded the evidence about whether appellant told the gun shop owner why she purchased the gun a month before the shooting on the grounds of: (1) lack of relevance due to remoteness; and, (2) lack of trustworthiness. *Id.* We agreed that the evidence was properly excluded under either of those rationales. *Id.* at 257–58, 503 A.2d 725. On the issue of remoteness, we stated:

> Since, however, the duration of states of mind or emotion varies with the particular attitudes or feelings at issue and with the cause, it is reasonable to require as a condition of invoking the continuity notion that the declaration mirror a state of mind which, in light of all the circumstances including proximity in time, has some probability of being the same condition existing at the material time. Where there is room for doubt, the matter should be left to the discretion of the trial judge.

*Id.* at 258, 503 A.2d 725 (citation omitted); *see also Purviance v. State,* 185 Md. 189, 198, 44 A.2d 474 (1945) ("The question of excluding evidence because of remoteness rests largely in the sound discretion of the trial judge"). *Cf. McCray v. State,* 305 Md. 126, 140–141, 501 A.2d 856 (1985) ("[E]vidence of declarations of a plan, design or intention presently entertained by

---

8. As of July 1, 1994, this exception was codified in Maryland Rule 5–803(b)(3), which exempts from the rule against hearsay "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant's then existing condition or the declarant's future action, . . ."

the declarant is, subject to the usual limitations as to remoteness in time and apparent sincerity common to all declarations of mental state, admissible when offered as evidence that the design was carried out by acts or omissions of the declarant").

As in *Robinson*, McQueen's statement in early August 2006 as to his state of mind did not go directly to show anything about his state of mind on September 26, 2006, the night he sustained a gunshot wound to his head. Moreover, even if there were "room for doubt," we are persuaded that the matter was appropriately left to the discretion of the trial judge.

Additionally, as in *Robinson*, there still "loom[s] the insurmountable evidentiary hurdle of untrustworthiness." *Robinson*, 66 Md.App. at 260, 503 A.2d 725. As we stated, "with respect to this and any other spontaneous declaration, there must be assurances of reliability." *Id.* Further, "such declarations, 'must appear to have been made in a natural manner and not under circumstances of suspicion.' " *Id.* (citation omitted).

Here, the trial court specifically addressed the trustworthiness of the statements when it stated: "I find there's just not one scintilla of evidence to suggest that the reaction to being arrested for a serious charge and comments made during that process was somehow related to any notions of suicide." We discern neither error nor abuse of discretion in the court's ruling, and we concur that the statements were too remote and untrustworthy to the fact sought to be proved, *i.e.*, that McQueen committed suicide because he was somehow distraught, in whole or in part, about the prior arrest for driving under the influence or while intoxicated.

 Further, we agree that any error was harmless beyond a reasonable doubt in this case. In criminal cases, "error is harmless if a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict." *State v. Blackwell*, 408 Md. 677, 698, 971 A.2d 296 (2009) (internal quotation marks and citations omitted); *see*

*also Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976) (error will be harmless when reviewing court, upon independent review, is able to declare a belief beyond a reasonable doubt that there is no reasonable possibility that the error contributed to the verdict); *Clark v. State,* 140 Md.App. 540, 565, 781 A.2d 913 (2001) (error for appellate purposes "may not be predicated upon a ruling that admits or excludes evidence unless the party is prejudiced by the ruling" (citing Md. Rule 5–103(a))), *cert. denied,* 368 Md. 527, 796 A.2d 695 (2002).

Initially, we note that the State contends that the omission of Officer Hegger's testimony was harmless because several witnesses testified that McQueen was not distraught or upset about the prior arrest in Georgia. That there was contradictory evidence of the decedent's good state of mind does not render omission of Officer Hegger's testimony harmless. Instead, any error was harmless because there was ample other evidence which permitted the jury to consider whether McQueen's death was, in fact, a suicide.

As appellant's counsel notes elsewhere in his brief, the blood spatter evidence was "pivotal in this case." One of the defense experts, Professor MacDonnell, opined that McQueen's right arm was upright and above shoulder level at the moment of impact. The jury could rationally consider whether McQueen was holding the gun at that point based on this testimony.

Another defense expert, Dr. Di Maio, clearly testified that McQueen died "as the result of a self-inflicted gunshot wound; that this case is a suicide." Even Dr. Allan conceded that contact gunshot wounds are common in suicides, and many people will not leave notes or announce to family members that they are considering suicide. There was also little evidence suggesting a conflict between McQueen and appellant, especially on the night in question. Finally, the jury heard, through appellant's statement, that it was appellant's opinion that McQueen "killed himself."

Thus, there was a sufficient basis for the jury to determine whether McQueen died at his own hands or at the hands of appellant. Indeed, we note that during jury selection, the jury was asked if they, or a family member, had ever attempted suicide, and twenty-one prospective jury members responded affirmatively to the question. The defense theory was clear, and exclusion of the evidence that the victim had been arrested for drunk driving one month before the shooting was harmless beyond a reasonable doubt.

## II.

Appellant next contends that the court erred in propounding an instruction on voluntary intoxication, over defense objection, because it was not generated by the evidence. Appellee counters that the instruction was generated and that it was not error for the court to give the instruction over appellant's objection. While we agree with appellant that the instruction was not generated by the evidence, we also hold that the instructional error was harmless beyond a reasonable doubt.

At the conclusion of all the evidence, the State requested the court to give the pattern voluntary intoxication instruction. The State argued that a State's witness, Lara Budeit, had testified that appellant was drunk when he called her at 11:30 p.m. on the night in question. Appellant's trial counsel objected, stating: "We're not asking for that." After the State responded, the court observed that there was no direct evidence that appellant was intoxicated, only that "according to that witness, but that's not evidence that he was drunk. That's evidence that that witness believed he was drunk." However, after noting the quantity of alcohol consumed, as well as the smoking of marijuana, the court ruled that there was "a reasonable inference ... that a person was intoxicated ..."

Appellant's defense counsel maintained that he was not asserting voluntary intoxication as a defense and that it was inappropriate to give the instruction over defense objection. Counsel directed the court to *Hardaway v. State*, 317 Md. 160,

562 A.2d 1234 (1989), a case where the Court of Appeals reversed because the trial court, over defense objection, instructed the jury that the defendant had a constitutional right not to testify and that no adverse inference should be drawn from the defendant's election of that right. The trial court in this case observed that *Hardaway* concerned a constitutional right, and that defense counsel was comparing "apples and hand grenades."

The State responded that *Evans v. State*, 28 Md.App. 640, 722, 349 A.2d 300 (1975), supported its position that the voluntary intoxication instruction could be given over defense objection. In that case, this Court recognized that, ordinarily, "the defendant is obliged to start matters off by putting in some evidence of his defense." *Id.* at 723, 349 A.2d 300. However, this Court also acknowledged that the prosecution could present evidence of an affirmative defense, and that, in such an instance, "the matter of defense is properly an issue though the defendant himself produces nothing further to support it." *Id.*

The prosecutor further analogized to *Hook v. State*, 315 Md. 25, 553 A.2d 233 (1989), also a murder case concerning the defense of voluntary intoxication, where the Court of Appeals held it was error to permit the State to *nol pros* a lesser included offense over defense objection. *Id.* at 42–44, 553 A.2d 233. The court accepted the analogy, stating that "[n]o one can suggest that the evidence in this case doesn't generate that instruction," and therefore, the instruction was appropriate and would be given to the jury.

In response, defense counsel contended that depraved heart murder and involuntary manslaughter were not lesser included offenses and that it would be inappropriate to give those instructions.[9] The prosecutor responded that there was sufficient evidence for the jury to decide whether appellant acted with reckless disregard for human life in this case by putting a gun to the victim's head and pulling the trigger.

---

9. Appellant does not maintain this argument on appeal.

Thereafter, in addition to instructing the jury as to first degree murder, second degree specific intent murder and second degree murder with intent to commit serious bodily harm, the court gave the pattern instructions for second degree depraved heart murder and involuntary manslaughter—grossly negligent act. *See* Maryland State Bar Ass'n, *Maryland Criminal Pattern Jury Instructions* 4:17.8(A), (B), at 258–59 (2006) ("MPJI–Cr"). The court also gave an instruction on voluntary intoxication that substantially mirrored the pattern instruction for Voluntary Intoxication/Specific Intent.[10]

■ Maryland Rule 4–325(c) requires that a trial court "give a requested instruction that correctly states the applicable law and that has not been fairly covered in other instructions." *General v. State*, 367 Md. 475, 485, 789 A.2d 102 (2002). Pursuant to the Rule, a requested instruction must be given " 'when the following three-part test has been met: (1) the instruction is a correct statement of law; (2) the instruction is applicable to the facts of the case; and (3) the content of the instruction was not fairly covered elsewhere in instructions actually given.' " *LaPin v. State*, 188 Md.App. 57, 69, 981 A.2d 34 (2009) (quoting *Dickey v. State*, 404 Md. 187, 197–98, 946 A.2d 444 (2008)). As this Court has stated, "[t]his rule 'has been interpreted to require that a requested instruction be given only where there is evidence in the record to support it.' " *Flores v. State*, 120 Md.App. 171, 193, 706 A.2d 628 (1998) (quoting *Hof v. State*, 337 Md. 581, 612, 655 A.2d 370 (1995)); *accord Dishman v. State*, 352 Md. 279, 292, 721 A.2d 699 (1998).

■ The issue is whether there was sufficient evidence to generate a voluntary intoxication instruction. It is well settled law in Maryland that "[v]oluntary intoxication, although it will never be allowed to negate a general criminal intent, may, if sufficient, be found to have eroded a specific

---

**10.** After the jury was instructed, defense counsel renewed his objections to the trial court's instruction.

intent." *Wieland v. State,* 101 Md.App. 1, 32, 643 A.2d 446 (1994). The degree of intoxication required to negate specific intent, however, is substantial. *Shell v. State,* 307 Md. 46, 61, 512 A.2d 358 (1986). In *State v. Gover,* 267 Md. 602, 298 A.2d 378 (1973), the Court of Appeals held:

> [V]oluntary drunkenness can be a defense to a specific intent crime, but the degree of intoxication which must be demonstrated to exonerate a defendant is great. Evidence of drunkenness which falls short of a proven incapacity in the accused to form the intent necessary to constitute the crime merely establishes that the mind was affected by drink so that he more readily gave way to some violent passion and does not rebut the presumption that a man intends the natural consequences of his act.

*Id.* at 607–08, 298 A.2d 378; *see also Lewis v. State,* 79 Md.App. 1, 12–13, 555 A.2d 509 ("[T]he single fact that one has consumed what some may consider to be an inordinate amount of alcohol, standing alone, with no evidence as to the effect of that alcohol on the defendant, would not permit a jury reasonably to conclude that he had lost control of his mental faculties to such an extent as to render him unable to form the intent to murder or to maim"), *cert. denied,* 316 Md. 549, 560 A.2d 1118 (1989).

In his brief to this Court, appellant cites several cases where courts in this State have addressed whether a trial court's decision *not* to give a voluntary intoxication instruction constitutes an abuse of discretion. *See Lewis,* 79 Md.App. at 8, 555 A.2d 509 (holding that trial court did not err in not giving a voluntary intoxication instruction); *Mock v. State,* 2 Md.App. 771, 775, 237 A.2d 811 (1968) (upholding trial court's decision not to give a voluntary intoxication instruction); *see also State v. Gover,* 267 Md. at 608, 298 A.2d 378 (affirming this Court's decision to remand for a new trial where, in a court trial, the court did not consider whether defendant's voluntary intoxication negated the mens rea necessary to support the conviction). However, neither party has cited a controlling case concerning whether the giving of a voluntary

intoxication instruction over defense objection amounts to reversible error.

We have found a number of out-of-state cases where courts have held that it was not reversible error to give a voluntary intoxication instruction over defense objection where there was some evidence of intoxication. *See People v. Loden*, 27 Ill.App.3d 761, 327 N.E.2d 58, 61 (1975) (concluding court did not err in giving intoxication instruction over defense objection because some evidence of defendant's intoxication had been introduced in an exculpatory manner); *State v. Jenkins*, 412 N.W.2d 174, 177 (Iowa 1987) (concluding that, where there was evidence defendant was intoxicated, trial court did not err in giving intoxication instruction, as well as insanity defense instruction, over defense objection); *Lawrence v. State*, 3 So.3d 754, 758–59 (Miss.Ct.App.2008) (holding, in a case where there was evidence of intoxication, that the trial court did not err in giving voluntary intoxication instruction over defense objection), *cert. denied*, 11 So.3d 1250 (Miss.2009); *State v. Johnson*, 207 S.W.3d 24, 43–44 (Mo.2006) (holding there was no plain error in giving a voluntary intoxication instruction over defense objection that the instruction distracted the jury from a defense of diminished capacity), *cert. denied*, 550 U.S. 971, 127 S.Ct. 2880, 167 L.Ed.2d 1156 (2007); *State v. Lamb*, 213 Neb. 498, 330 N.W.2d 462, 468 (1983) (rejecting defendant's claim that instruction on intoxication over defense objection violated defendant's right to attorney-client privilege and denied due process where the instruction was supported by evidence and was not prejudicial); *see also Dunlop v. State*, 724 N.E.2d 592, 595 (Ind.2000) (holding, in a case where defense expert opined that defendant was suffering a mental disorder caused by cocaine intoxication at the time of the crime, that trial court erred in giving a specific voluntary intoxication instruction over defense objection, but the error was harmless beyond a reasonable doubt).

In addition to these cases, our research has led us to one case where the court found reversible error where there was an absence of sufficient evidence of intoxication, and the instruction was given over defense objection. *See State v.*

*Woods,* 249 Neb. 138, 542 N.W.2d 410, 416 (1996) (reversing where trial court gave intoxication instruction over defense objection, because defendant made no attempt to rely on voluntary intoxication as a defense, where the evidence did not support a finding of intoxication, and where the instruction could have materially influenced the jury to reject defendant's claim of self-defense).

As he did in the trial court, appellant primarily relies on *Hardaway v. State,* 317 Md. 160, 562 A.2d 1234 (1989). In *Hardaway,* defense counsel requested that the trial court not instruct the jury that Hardaway had a right not to testify and that no adverse inference should be drawn from his failure to testify. *Id.* at 161, 562 A.2d 1234. On appeal, Hardaway maintained that the instruction "may inadvertently harm a defendant by calling to the jury's attention the defendant's election not to testify." *Id.* at 163, 562 A.2d 1234. The State responded that the instruction could not be improper because it benefits the defendant. *Id.*

The Court of Appeals agreed with Hardaway and held that giving the instruction, over defense objection, amounted to reversible error. *Id.* at 169, 562 A.2d 1234. Recognizing that the instruction is a constitutional right of the defendant, the Court reasoned: "Since the instruction is a right of the defendant, for his benefit, but because the beneficial effect of the instruction may be uncertain in some circumstances, it follows that the decision whether the instruction is given should lie with the defendant." *Id.* at 167, 562 A.2d 1234.

The Court of Appeals subsequently distinguished *Hardaway* in *Carter v. State,* 366 Md. 574, 785 A.2d 348 (2001). In *Carter,* the Court ultimately reversed because: (a) the trial court abused its discretion in denying several motions for mistrial based on two instances during trial when the jury heard unsolicited other crimes evidence; and, (b) when the prosecutor referred to prejudicial facts not in evidence during closing argument. *Carter,* 366 Md. at 590–92, 785 A.2d 348. While those were the bases for the Court's reversal, the Court also considered whether the trial court erred in giving caution-

ary instructions following the unsolicited other crimes evidence, over defense objection. *Id.* at 582, 785 A.2d 348.

The petitioner maintained that "the defense should have an absolute right to refuse a curative instruction that carries the potential for highlighting the prejudicial information." *Id.* On this issue, the Court disagreed with petitioner. *Id.* at 586–88, 785 A.2d 348. Concluding that *Hardaway, supra,* was distinguishable because that case involved the defendant's constitutional right against self-incrimination, the Court stated:

> In contrast, a defendant's right not to have evidence of prior bad acts admitted in evidence is derived from statute, evidentiary rules, and the common law. Unlike the situation in *Hardaway,* a defendant does not have an absolute right to a curative instruction regarding the inappropriate admission of prejudicial evidence. Correspondingly, a defendant does not have an absolute right to waive, reject, or veto the court's decision to give such an instruction.

*Carter,* 366 Md. at 587, 785 A.2d 348.

Further, the Court observed that "a curative instruction is not always for the sole benefit of the defendant. The public has an interest in the conduct of 'fair trials designed to end in just judgments,'" and "[j]ury instructions guide deliberations of the jury and benefit the State and the public." *Id.* (citations omitted). Moreover, after stating that the curative instruction was designed to "guide the jury in its receipt of the evidence," the Court also stated: "We are not dealing here with the waiver of a constitutional protection, but rather with the exercise of the trial court's duty to all participants in the criminal justice system-the defendant, the State, and the jury." *Id.*

As the Court of Appeals did in *Carter,* we conclude that *Hardaway* is distinguishable from the instant case. Indeed, the Supreme Court has ruled that a voluntary intoxication defense is not a fundamental right protected by federal due process:

> In sum, not every widespread experiment with a procedural rule favorable to criminal defendants establishes a

fundamental principle of justice. Although the rule allowing a jury to consider evidence of a defendant's voluntary intoxication where relevant to *mens rea* has gained considerable acceptance, it is of too recent vintage, and has not received sufficiently uniform and permanent allegiance, to qualify as fundamental, especially since it displaces a lengthy commonlaw tradition which remains supported by valid justifications today.

*Montana v. Egelhoff,* 518 U.S. 37, 51, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996).

Therefore, we conclude that whether the instruction was requested by the defense or the State is not determinative. As is settled with claims of instructional error, the issue is simply whether the instruction was an accurate statement of law and was generated by the evidence actually admitted at trial.

■■ In this case, there is no dispute concerning the instruction's accuracy. Instead, appellant's claim concerns whether the instruction was generated. Based on our review, we are persuaded that the evidence of intoxication does not rise nearly to the level necessary to generate a voluntary intoxication instruction. We explain.

To be sure, there was evidence that appellant consumed a good deal of alcohol over the course of the evening. Starting at around 5:30 or 6:00 p.m., appellant drank a couple of beers and smoked some marijuana at home in the early evening prior to going to the VFW, where he drank five or six mixed drinks over a two to three hour period. After that, he drank one beer at the Village Café before returning home between 11:30 p.m. and midnight. While the consumption of approximately nine alcoholic beverages over an approximately six hour span may seem like an inordinate amount of alcohol, that in itself, "with no evidence as to the effect of that alcohol on the defendant, would not permit a jury reasonably to conclude that he had lost control of his mental faculties to such an extent as to render him unable to form the intent to murder or to maim." *Lewis,* 79 Md.App. at 12–13, 555 A.2d 509.

Further, there was no clear evidence of the effect of the alcohol on the appellant or that appellant was intoxicated. Carl Davis, who saw appellant at the VFW, testified that he talked with and played pool with appellant and that appellant seemed to be having a good time. He did not testify that appellant seemed drunk. Likewise, Lynsay Dodd, who was working at the Village Café, testified that she saw appellant there, but she did not testify that appellant seemed drunk. Furthermore, Officer Gregg Knott, of the Montgomery County Police, testified that he did not detect a strong odor of alcohol on appellant's person when he transported him to the police station at around 2:30 a.m. At the police station, when asked how he felt, appellant replied that he felt "[s]ober as I've ever fucking been."

The State's request for the voluntary intoxication instruction rested primarily on the testimony of Lara Budeit. At around 11:40 p.m. the evening of the shooting, appellant called Lara Budeit, a friend from high school. Budeit testified that when she picked up the phone, she believed appellant was "drunk dialing" her. Budeit explained that "[d]runk dialing is something you do when you're drunk and you call somebody you haven't talked to in a long time." During the phone conversation, appellant seemed upset, and both appellant and Budeit "agreed that people suck." Budeit did not know what upset appellant, and, when asked whether he appeared intoxicated, Budeit responded, "I, he repeated himself a couple times. He told me how great of a friend I was and he repeated that like five or six times."

Appellant may also have called Deborah Hale at around 11:00 p.m. on the night in question. While Hale recalled telling the prosecutor and a detective during an interview that appellant had called her "drunk" on a number of occasions, Hale could not remember if that occurred on September 25, 2006.

This evidence was not sufficient to support the voluntary intoxication instruction in this case. Indeed, Budeit never specifically testified that appellant was intoxicated, responding

only that he repeated himself and told her how great a friend she was. Additionally, while appellant had been "drunk" when he called Hale on several occasions, Hale was not sure if appellant was drunk when he called her on the night in question.

Hence, even assuming an inference could be drawn that appellant was intoxicated, suffice it to say that no reasonable juror could infer from their testimony that appellant "was so intoxicated that he was robbed of his mental faculties or that he did not appreciate what he was doing." *Lewis,* 79 Md.App. at 8, 555 A.2d 509. Accordingly, the voluntary intoxication instruction was not generated by the evidence in this case.

Having concluded that the trial court erred in giving the instruction, we turn to whether that error was harmless beyond a reasonable doubt. *See Hedgpeth v. Pulido,* 555 U.S. 57, 129 S.Ct. 530, 532, 172 L.Ed.2d 388 (2008) (per curiam) ("harmless-error analysis applies to instructional errors so long as the error at issue does not categorically 'vitiate *all* the jury's findings' ") (emphasis in original, citation omitted); *see also Alston v. State,* 414 Md. 92, 107–08, 994 A.2d 896 (2010) (restating the standard for whether an error in a criminal case may be harmless); *Martin v. State,* 165 Md.App. 189, 204, 885 A.2d 339 (2005) (concluding that even failure to instruct on an offense does not constitute structural error and any error is subject to harmless error review), *cert. denied,* 391 Md. 115, 892 A.2d 478 (2006).

As we have indicated, we agree with appellant's suggestion that the evidence in this case did not generate a voluntary intoxication instruction. Implicit in this conclusion is that appellant was *not* so intoxicated that he could *not* form a specific intent to commit the charged crimes, including the first degree murder count. Given this, it is questionable how the voluntary intoxication instruction prejudiced the defense. As a matter of fact, appellant was acquitted of first degree murder, second degree specific intent murder, and second degree murder with intent to inflict serious bodily harm.

Moreover, the instruction did not state that the jury *must* find appellant guilty of depraved heart murder based on the appellant's intoxication. Instead, the jury simply was instructed that they "should *consider* depraved heart murder." (emphasis added). That charge was properly submitted to the jury.

Looking to the indictment, the first count charged appellant with the murder of McQueen, using the short form authorized by Md.Code (2002, 2010 Supp.), § 2–208 of the Criminal Law Article ("C.L."). Charging appellant under that statutory form was sufficient to also charge appellant with second degree murder. *See Dishman,* 352 Md. at 289–90, 721 A.2d 699 (reaffirming that a short form indictment "alleging first degree murder also charges second degree murder and manslaughter") (emphasis omitted); *see also Blackwell v. State,* 278 Md. 466, 476, 365 A.2d 545 (1976) ("In first degree murder indictments filed pursuant to this provision, it is well settled that murder in the second degree and manslaughter are lesser included offenses"), *cert. denied,* 431 U.S. 918, 97 S.Ct. 2183, 53 L.Ed.2d 229 (1977); *State v. Evans,* 278 Md. 197, 199 n. 1, 362 A.2d 629 (1976) ("Under such an indictment the accused could be found guilty of the lesser offenses of murder in the second degree and manslaughter"); *McMillan v. State,* 181 Md.App. 298, 351, 956 A.2d 716 ("[A]ppellant's indictment, which conformed in every relevant way with the statutory form specified in C.L. § 2–208, invested the circuit court with jurisdiction to try him for murder of any variety— including felony-murder"), *cert. granted,* 406 Md. 744, 962 A.2d 370 (2008).[11]

Appellant's position appears to be that he wanted the jury to decide simply whether McQueen died of a homicide or

---

**11.** As noted, the court gave the pattern depraved heart jury instruction. *See* MPJI–Cr 4:17.8(A). Depraved heart murder is one of the four types of second degree murder. *See Alston,* 414 Md. at 109 n. 5, 994 A.2d 896 (listing the four types as (1) intent to kill; (2) intent to inflict grievous bodily harm such that death would be the likely result; (3) depraved heart; and (4) felony murder, where the killing is committed during certain felonies).

a suicide, without any consideration of whether appellant's voluntary intoxication negated his mental state to some degree. Appellant, in effect, wanted the jury to make an "all or nothing" choice. But, it is clear that a trial court may instruct on an uncharged lesser offense, even over defense objection. *See Hagans v. State*, 316 Md. 429, 455, 559 A.2d 792 (1989) (holding that convictions on uncharged lesser included offenses were proper, where prosecutor agreed with trial court's decision to instruct the jury on those offenses over defense counsel's objection); *see also Smith v. State*, 412 Md. 150, 170, 985 A.2d 1204 (2009) (stating that the decision to submit an uncharged lesser included offense "presents an important choice for *both* parties: whether to submit an uncharged lesser included offense to the jury or hope that the jury will choose the desired result when it has an 'all or nothing' choice") (emphasis added); *Johnson v. State*, 90 Md.App. 638, 646, 602 A.2d 255 (1992) ("the trial judge, *on the request of either party*, must (1) properly instruct the jury on a lesser included offense fairly raised by the evidence; and (2) permit the jury to return a verdict on that offense") (emphasis added).

When the State asked the court to instruct the jury on depraved heart murder, the trial court could charge the jury to consider that offense, even over defense objection. Thus, to the extent appellant was concerned about the possibility of a compromise verdict, that possibility existed regardless of the voluntary intoxication instruction. Accordingly, we are not persuaded that appellant was prejudiced by the voluntary intoxication instruction under the circumstances of this case.

█ Furthermore, we are convinced that the evidence was sufficient to sustain the jury's verdict in this case. As the Court of Appeals has recognized "[d]epraved heart murder does not require an intent to kill." *Dishman*, 352 Md. at 298, 721 A.2d 699. Instead, "[d]epraved heart murder requires that the 'defendant . . . commit an act imminently dangerous to others and evincing a depraved and malignant heart regardless of human life and fatally bent on mischief. . . . He is

indifferent as to whether death results, or he may even hope that it will not result.' " *Id.* (citation omitted).

Here, on September 25, 2006, starting at around 5:30 or 6:00 p.m., appellant and McQueen began socializing together, and that included smoking marijuana as well as drinking alcoholic beverages, up until at least 11:00 p.m. Appellant gave three different versions of the ensuing events to the police. In the first version, he denied being in the apartment when McQueen was shot, and denied that there was a gun in the house.

In the second version, appellant maintained that he was not present at the time of the shooting, but admitted that his own .38 Smith and Wesson handgun was on the floor near McQueen's hands when appellant discovered him. Upon finding McQueen dead, appellant left the apartment and threw the gun and the bullets in Lake Needwood. It was only after he disposed of the gun in this manner that appellant finally called 9–1–1.

In appellant's third version, he finally admitted that he was, in fact, inside the apartment at the time of the shooting. According to this version, appellant took out the loaded .38 handgun, and placed it within reach of McQueen before appellant went to the bathroom. While he was in the bathroom, appellant heard the gunshot and then emerged to find McQueen bleeding from a gunshot wound to the head. Not knowing what to do, appellant first decided to dispose of the gun. After he returned from the lake, and after contemplating putting a different gun in McQueen's hands, appellant finally called 9–1–1.

When police arrived at around 1:00 a.m. on September 26, 2006, appellant was found outside the apartment, crying and yelling, "He's dead. He's dead." Appellant had a considerable amount of blood on his hands, face, shirt, and shoes, and the parties agreed that this blood tested positive for the presence of blood DNA from McQueen.

A significant amount of ammunition was recovered from appellant's car. Additionally, both appellant's and McQueen's hands tested positive for gunshot residue. The State's foren-

sic pathologist, Dr. Allan, concluded that, to a reasonable degree of medical certainty, the manner of death in this case was homicide.

While there was a considerable amount of expert testimony in this case, the jury could have chosen to believe the State's blood spatter expert, Dr. William Vosburgh, who concluded that appellant's shoe created a void at the top of a blood stain on the carpet. Dr. Vosburgh also opined that appellant's hand produced a void on the carpet "that [was] in the way at that moment getting blood cast upon it, and a spray of blood going between the [fingers]."

Further, the jury heard appellant's statement that he told his "best friend," presumably McQueen, he shot a twelve-year-old boy in Iraq, and that McQueen recoiled from that revelation. The jury also learned that appellant had sought treatment at Walter Reed Hospital because he was "depressed and disillusioned," but was turned away because he was not active in the Army at the time.

There was also evidence before the jury about incidents where appellant had been careless with firearms, including accounts that appellant: (1) left a loaded M-4 rifle in an unsafe position while on patrol in a Humvee in Iraq; and, (2) sat down next to a fellow Ranger at a party at appellant's home and began loading an automatic pistol while that pistol was pointed at his friend's leg. In addition, this same fellow Ranger thought appellant was "[l]ess than honest" and was known to embellish the truth. And, according to a Chief Warrant Officer stationed with appellant at Fort Benning, Georgia, appellant had a reputation for telling tales and was known to lie. Considering all this, there was sufficient evidence for the jury to have convicted appellant of the second-degree depraved heart murder of McQueen.

Finally, we address appellant's contention that he was denied his due process right to present a defense because the voluntary intoxication instruction undermined his theory of the case that the victim's wounds were self-inflicted. We have been unable to find, nor have we been directed to, any place in

the record where defense counsel raised this specific constitutional due process claim now being asserted on appeal. Accordingly, we conclude these grounds are not preserved for our review. See Md. Rule 8–131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court ....."); *see also Robinson v. State,* 404 Md. 208, 217–18, 946 A.2d 456 (2008) (declining to consider appellant's constitutional issue, raised for the first time on appeal); *Klauenberg v. State,* 355 Md. 528, 541, 735 A.2d 1061 (1999) (observing that, when specific grounds are given for an objection, the objecting party may not raise other grounds on appeal).

Moreover, even if preserved, we again note that a voluntary intoxication defense is not a fundamental right protected by federal due process. *See Montana v. Egelhoff,* 518 U.S. at 51, 116 S.Ct. 2013. Additionally, while the State did refer during closing argument to the fact that appellant had been drinking on the night of the shooting, we note that defense counsel also relied on the drinking and marijuana use to explain his reactions after McQueen was shot. Counsel argued that appellant was "thinking, oh my God, I have marijuana here; it's my mother's gun. I brought the gun into the house. I didn't protect my friend; we were drunk. Or at least Michael was drunk. I just joined the reserves. They're not going to believe me. There's no witnesses." Defense counsel then continued that appellant just reacted, but that "he reacts in a terribly unfortunate way ..." Based on this, we are not convinced that giving a voluntary intoxication instruction over defense objection fundamentally denied appellant his due process right to a fair trial or his right to present a defense.

### III.

Appellant next challenges the court's decision to admit McQueen's statement to Ronnie McKay that "Gary is not right in the head" on the grounds that it was hearsay. Appellant also asserts that the court erred in allowing evidence of this statement during the redirect examination of Dr. Allan.

The State disputes appellant's contention that the statement was admitted during Dr. Allan's testimony, and that, in any event, the prosecutor's question about the statement was a proper response to evidence introduced by the defense during cross-examination. The State further responds that the trial court properly exercised its discretion because the statement was not admitted for its truth, but instead was admissible to rebut appellant's claims that there were no problems between himself and McQueen.

In reply, appellant agrees that, when Ronnie McKay initially testified to the statement, it was not offered for its truth. However, appellant maintains that the State's questioning of Dr. Allan was prejudicial because the purpose of the question "was to associate the statement with the alleged motive of Appellant."

We begin where the parties apparently agree, that is, whether the statement McQueen made to McKay constituted nonhearsay. During appellant's opening statement, appellant's counsel suggested that McQueen and appellant were "good friends," were "loyal Army ranger buddies," "protected each other," "never, never had a fight, let alone an argument" and that "Gary Smith would never hurt Mike." This theme continued throughout opening statement, and was also repeated during closing argument when counsel referred to the victim as appellant's "Ranger buddy."

During trial, Ronnie McKay testified that he spoke with McQueen the day he died and that, during that conversation, McQueen told him "he can't live there no more. The apartment he lived in. Because he said, you know, Gary is not right in the head." The court admitted this testimony, over defense objection, because defense counsel had argued in opening statement that "there was no evidence of a problem" between appellant and McQueen.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5–801(c). "If the declaration is not a statement, or if

it is not offered for the truth of the matter asserted, it is not hearsay and it will not be excluded under the hearsay rule." *Parker v. State,* 408 Md. 428, 436, 970 A.2d 320 (2009) (citation omitted); *see also Conyers,* 354 Md. at 158, 729 A.2d 910 ("An out-of-court statement is admissible if it is not being offered for the truth of the matter asserted or if it falls within one of the recognized exceptions to the hearsay rule"). We agree that the statement was not admitted for its truth, but instead was relevant to appellant's claims that there were no problems between appellant and McQueen.

Turning to whether the court erred by again admitting evidence of this statement during the redirect examination of Dr. Allan, we begin by observing that, on cross-examination, Dr. Allan was asked if she received any information in this case "that there was any motive on the part of Mr. Smith to kill his friend." Dr. Allan agreed that she had not received any such information.

Thereafter, during redirect examination, the State began to ask Dr. Allan whether she knew about McKay's statement. The court overruled defense counsel's objection to this question, noting that the issue of motive was raised by the defense. Dr. Allan then testified that she was not aware of McQueen informing McKay that "the day of this incident, within 24 hours, that the defendant was messed up in the head and that he, Michael McQueen, had to get out of that place."

We conclude that the issue was properly left to the trial court's discretion. As the Court of Appeals has stated:
"Any competent evidence which explains, or is a direct reply to, or a contradiction of, material evidence introduced by the accused may be produced by the prosecution in rebuttal." *Lane v. State,* 226 Md. 81, 90, 172 A.2d 400 (1961) (emphasis added). It is equally well settled that the State's case-in-chief may include "rebuttal" evidence to which the defense has "opened the door," either during opening statement, or through cross-examination of a State's witness.
*Johnson v. State,* 408 Md. 204, 226, 969 A.2d 262 (2009); *see also State v. Booze,* 334 Md. 64, 70, 637 A.2d 1214 (1994)

(stating that rebuttal evidence is admissible where it "explains, or is a direct reply to, or a contradiction of, any new matter that has been brought into the case by the accused"); *Hyman v. State*, 158 Md.App. 618, 631, 857 A.2d 1166 ("Rebuttal evidence is within a trial court's sound discretion and will not be disturbed on appeal unless there is an abuse of discretion" (citing *Booze*, 334 Md. at 68, 637 A.2d 1214)), *cert. denied*, 384 Md. 449, 863 A.2d 998 (2004).

By asking Dr. Allan about motive during cross-examination, the door was opened for the State to ascertain whether Dr. Allan knew of McQueen's statement to McKay. As the evidence was properly admissible, there also was no error when the State commented on this evidence during closing argument.

 Finally on this issue, appellant also contends that the court erred in not permitting him to issue a body attachment for McKay when he failed to appear as a defense witness during the defense's case. The decision whether to issue a body attachment is clearly a matter of discretion. *See* Md. Rule 4–267(b) (stating that "... the court *may* order the issuance of a body attachment of a witness ...") (emphasis added); *see also Cross v. State*, 144 Md.App. 77, 94, 796 A.2d 145 (concluding trial court did not abuse its discretion in finding that witnesses were unavailable, and stating that it was not surprising that State was reluctant to incarcerate witnesses under Md. Rule 4–267(a), because "incarcerating witnesses should be done only when absolutely necessary"), *cert. denied*, 369 Md. 180, 798 A.2d 552 (2002).

We have reviewed the record and the arguments of counsel and we conclude there was neither error nor abuse of discretion in this instance. We note that appellant's counsel conceded that he was in possession of McKay's statement when McKay was subjected to cross-examination. Further, the court found that defense counsel did not comply with the time requirements for filing a subpoena to secure McKay's attendance as a defense witness.

Additionally, considering that defense counsel wanted to explore what McKay thought McQueen meant by the statement that "Gary is not right in the head," we agree with the trial court's assessment that the evidence called for speculation. We are also persuaded that the trial court did not abuse its discretion by sustaining an objection when defense counsel later attempted to elicit similar evidence concerning what McKay thought McQueen meant through another witness, Detective Reilly.

## IV.

Appellant next contends that the trial court erred in limiting his cross-examination of the State's blood stain expert, Dr. Vosburgh, by precluding inquiry about Dr. Vosburgh's prior testimony in a number of unrelated cases, because that prior testimony tended to establish bias, as well as inconsistent statements. The State disagrees. We hold that the trial court properly exercised its discretion on this issue.

Prior to trial, appellant filed a motion in limine to permit cross-examination of Dr. Vosburgh concerning his expert testimony in *State v. Albert Givens,* K–1992–02270, in Anne Arundel County. During a hearing on that motion, defense counsel proffered that Dr. Vosburgh performed a presumptive blood test on the alleged murder weapon in *Givens,* and that test came back negative. Five days later, Dr. Vosburgh again tested the alleged weapon and this test came back positive. At Givens' first trial, Dr. Vosburgh only testified concerning the positive result. The negative result was not disclosed to the defense until shortly before Givens's retrial.[12]

The motions court accepted the proffer, but found that this failed to establish that Dr. Vosburgh purposefully concealed potentially exculpatory evidence. The court also noted that the information may not have come into evidence in the first trial simply because defense counsel there may not have asked

---

12. The results of both of Dr. Vosburgh's examinations were excluded at the second murder trial.

Dr. Vosburgh about other tests he performed on the alleged murder weapon.

During this same motions hearing, appellant's counsel also wanted to ask Dr. Vosburgh about his testimony in another Anne Arundel County murder trial, *State v. Scotland Williams*, 02K980000675. According to counsel's proffer, in that case, Dr. Vosburgh testified "to a reasonable degree of certainty that by looking at certain cells you can tell the race of the cell." This evidence was excluded from the retrial in the *Williams* case because the trial court there ruled there was no basis for Dr. Vosburgh's opinion. Appellant's counsel in this case then argued that he should be able to cross-examine Dr. Vosburgh on this other case as it tended to establish bias. The court ultimately denied the motions, but ruled that these issues could be addressed again during trial.

During trial, Dr. Vosburgh testified concerning his experience, training and education, including his expertise in the field of blood stain pattern analysis. Defense counsel then extensively examined Dr. Vosburgh through voir dire of the proffered field. During a bench conference, defense counsel reminded the court that he wanted to be able to question Dr. Vosburgh about these other cases, and the court indicated it could be brought up later after the expert was accepted. Dr. Vosburgh was accepted as an expert in the analysis of blood stain patterns.

At the conclusion of Dr. Vosburgh's direct examination, and after the jury was excused, defense counsel renewed his motion to be permitted to inquire about Dr. Vosburgh's prior testimony in the *Givens* case. As clarified by the trial court, defense counsel wanted to examine Dr. Vosburgh on the fact that he did not disclose arguably exculpatory information to the prosecutor in Givens's first murder trial, *i.e.*, that one of two blood tests on the murder weapon came back negative. Defense counsel maintained that he should be permitted to question Dr. Vosburgh about the *Givens* case as it went to the issue of bias.

The State responded by suggesting that Dr. Vosburgh's examinations in the *Givens* case were akin to not finding a fingerprint on a car bumper, then going back and finding a positive fingerprint on the steering wheel. Summarizing the State's argument, the fact that Dr. Vosburgh did not disclose that the first test of the murder weapon was negative, but did disclose that a subsequent test was a weak positive, was not exculpatory. The trial court denied defense counsel's request to examine Dr. Vosburgh about the *Givens* case, and rejected defense counsel's apparent suggestion that Dr. Vosburgh was being somehow "deceptive or deceitful" in that case.

Defense counsel also raised Dr. Vosburgh's opinion in the *Scotland Williams* case that he could tell a person's race from epithelial cells recovered from the crime scene. Defense counsel wanted to explore Dr. Vosburgh's testimony at these two trials because this established a "dereliction of the duty," which went "beyond the boundaries of accepted expert opinion," and which established "a pattern or partiality to the prosecution."

The trial court disagreed, noting that even if an expert's opinion was unreliable, that did not establish that the expert would be biased in all other cases. After further argument, the court sustained the State's objection and ruled that it would not permit "this kind of a collateral attack on an expert witness or any other kind of witness and it's outside the scope of his direct examination clearly."

Defense counsel then asked to be able to question Dr. Vosburgh about his testimony in *State v. Lucas,* held in Montgomery County, where Dr. Vosburgh gave a detailed reenactment of the crime scene.[13] Noting that Dr. Vosburgh agreed that it was not the best practice to do such reenactments, and that the prosecution in the *Lucas* case declined to offer that reenactment into evidence, defense counsel contended that he had established that Dr. Vosburgh has a "propensi-

---

13. On appeal, appellant informs us that this case was captioned as *State v. Robert Lucas,* No. 88621C.

ty to go beyond the boundaries of accepted practice in his field demonstrating a partiality to the State . . ." The court again disagreed, finding that there was no such pattern, and ruled that defense counsel could not cross-examine Dr. Vosburgh about the *Lucas* case.

Initially, we address appellant's contention that the court erred in limiting his cross-examination because Dr. Vosburgh's testimony in the other cases established that he was biased in favor of the State. "Cross-examination is a right guaranteed by the common law." *Myer v. State*, 403 Md. 463, 476, 943 A.2d 615 (2008). Additionally, "[t]he constitutional right of confrontation includes the right to cross-examine a witness about matters which affect the witness's bias, interest or motive to testify falsely." *Marshall v. State*, 346 Md. 186, 192, 695 A.2d 184 (1997) (citation omitted); *accord Martinez v. State*, 416 Md. 418, 428, 7 A.3d 56 (2010).

The Court of Appeals has stated that "[t]he scope of cross-examination lies within the sound discretion of the trial court." *Pantazes v. State*, 376 Md. 661, 681, 831 A.2d 432 (2003) (citations omitted). Discretion is exercised by balancing "the probative value of an inquiry against the unfair prejudice that might inure to the witness. Otherwise, the inquiry can reduce itself to a discussion of collateral matters which will obscure the issue and lead to the fact finder's confusion." *Id.* (quoting *State v. Cox*, 298 Md. 173, 178, 468 A.2d 319 (1983)); *see also Smith v. State*, 371 Md. 496, 504, 810 A.2d 449 (2002) (explaining that evidence of bias is always relevant and a proper subject of impeachment, but that these propositions are subject to Maryland Rules 5–402 and 5–403).

Additionally, "an expert witness may be questioned on cross-examination about compensation received for testifying, as well as about the expert's history of employment as an expert witness, in order to reveal bias or interest in the outcome of the proceeding." *Goldberg v. Boone*, 396 Md. 94, 116, 912 A.2d 698 (2006); *see also Scott v. State*, 310 Md. 277, 294, 529 A.2d 340 (1987) ("Evidence tending to show that an expert witness has frequently testified or otherwise been

involved in litigation for one party directly relates to the weight a jury may give the testimony.")

Here, Dr. Vosburgh was testifying to blood stains and blood spatter in connection with determining whether McQueen was a victim of a homicide or whether his death was a suicide. According to defense counsel's proffers, in *Givens,* the issue concerned Dr. Vosburgh's providing a positive result on an item of evidence, thus, arguably inculpating the defendant, but failing to disclose a negative result on that same item of evidence. While there is little doubt that this constituted a discovery violation in the *Givens* case, considering there was no suggestion that this omission was purposeful or intentional, this is insufficient to show that Dr. Vosburgh was biased in favor of one side or the other.

As for the *Williams* case, again according to the proffer, Dr. Vosburgh apparently gave an opinion that he could determine the race of an individual based on an examination of epithelial cells recovered from the crime scene. Even assuming, arguendo, that this opinion may be of questionable reliability, again we fail to see how this opinion establishes a bias in favor of the State.

Finally, as for the *Lucas* case, that case involved a detailed reenactment of the crime scene, a reenactment that was not offered into evidence by the prosecution. That an expert tends to perform reenactments in the course of his work does not demonstrate bias.[14]

While appellant certainly could show that Dr. Vosburgh was biased in favor of one party or other, appellant's attempts to establish that Dr. Vosburgh was biased in favor of the State simply because of his conclusions and methodology from other unrelated cases falls short. As the Court of Appeals has explained: "A judge must allow a defendant wide latitude to

---

14. During trial, defense counsel wanted to question Dr. Vosburgh about an out-of-court reenactment concerning this case that he gave to a group of medical examiners, and the court sustained the State's objection to questions about this presentation.

cross-examine a witness as to bias or prejudices, but the questioning must not be allowed to stray into collateral matters which would obscure the trial issues and lead to the factfinder's confusion." *Smallwood v. State,* 320 Md. 300, 307–308, 577 A.2d 356 (1990) (citations omitted); *accord Martinez, supra,* 416 Md. at 428, 7 A.3d 56.

In addition to challenging the court's ruling on the grounds of bias, appellant also contends that Dr. Vosburgh's testimony in another case was inconsistent with his testimony at appellant's trial. During Dr. Vosburgh's cross-examination, defense counsel asked him to name a case in which he had seen blood emerging from a contact wound to the right or left temple, and Dr. Vosburgh replied that he saw that in the *Pantazes* case, where the final of three shots "was to the right temple and there was back spatter and blow back that occurred onto a mirror to the right of the victim in the final position in this case." [15]

Later during cross-examination, defense counsel began to ask whether the *Pantazes* case also involved a contact wound. The State's objection was sustained, and, at the ensuing bench conference, defense counsel proffered that Dr. Vosburgh had testified in *Pantazes* that "blood vaporizes upon a shot and create[s] a mist." Counsel also proffered that Dr. Vosburgh testified in that case that blood exits from the head in a starburst type pattern with a contact wound. The State responded that this was outside the scope and the testimony from that trial was "completely out of context." The trial court agreed and sustained the State's objection.

Appellant maintains on appeal that the court erred because this proffered evidence was inconsistent with Dr. Vosburgh's trial testimony here, specifically that "[a]t maximum blood pressure from the wound, blood will eject the greatest distance away. At this greatest distance, this is only in the first moments after the shot is fired." We also observe that Dr.

---

**15.** The State notes that this refers to *Pantazes v. State,* 376 Md. 661, 831 A.2d 432 (2003).

Vosburgh testified in this case that the projected blood "would come out immediately following as the wound has been created, blood pressure is present inside the head. It would immediately follow the exit of the gases from the wound tract."

The State responds that there was no inconsistency because "[b]oth of these statements may be true at the same time." Further, the State suggests that "scientific evidence in the form of blood spatter is never going to be identical in two unrelated cases."

This Court has stated that, "[u]nder Rule 5–616(a)(1), 'the credibility of a witness may be attacked through questions asked of the witness, including questions that are directed at . . . proving under Rule 5–613 that the witness has made statements that are inconsistent with the witness's present testimony.'" *Fields v. State*, 168 Md.App. 22, 39–40, 895 A.2d 339, *aff'd*, 395 Md. 758, 912 A.2d 637 (2006); *see also Hill v. Wilson*, 134 Md.App. 472, 478–81, 760 A.2d 294 (2000) (upholding trial court's decision to permit impeachment of an expert witness with prior statements made in lectures and written documents).

While resolving whether the testimony was inconsistent may have been left to the fact finder, we recognize that "[p]reliminary questions concerning . . . the admissibility of evidence shall be determined by the court." Md. Rule 5–104(a); *see also* Md. Rule 5–611(a) ("The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment"). In any event, we are persuaded that the trial court did not abuse its discretion in limiting cross-examination in this instance. *See Jackson v. State*, 164 Md.App. 679, 725–26, 884 A.2d 694 (2005) (stating that, even where an appellate court might disagree with a ruling, the appellate court "will not presume to substitute its judgment for that of the trial court except in the rare

case in which the trial judge has literally abused his discretion"), *cert. denied,* 390 Md. 501, 889 A.2d 418 (2006).

Finally, we are satisfied that the jury had sufficient evidence from which to assess any alleged bias or inconsistencies that may have affected Dr. Vosburgh's credibility. During voir dire of the witness, the jury learned extensive information about Dr. Vosburgh's experience, training and education, including his expertise in the field of blood stain pattern analysis. The jury heard that Dr. Vosburgh was currently Director of the Consolidated Forensic Laboratory for the District of Columbia. Prior to this, Dr. Vosburgh was employed as a forensic dentist with the Armed Forces Medical Examiner System at Dover Air Force Base, for two and a half years. And prior to that, Dr. Vosburgh had been employed by other government agencies, including as Director of the Forensic Division in the Prince George's County Police Department, where he was employed for six years, and as a forensic chemist employed for ten years by Anne Arundel County. The jury also learned, through examination by defense counsel, that Dr. Vosburgh had never testified in court with respect to blood stain pattern analysis for the defense. Through this voir dire, the jury could determine whether Dr. Vosburgh was biased in favor of the State.

In addition to questions concerning Dr. Vosburgh's expertise and professional background, during trial, Dr. Vosburgh was subject to extensive cross-examination about his conclusions in this case, including, but not limited to: questioning the experiments he performed; having him demonstrate precisely how he believed McQueen was shot; and, asking him to review photographs of the crime scene. He was also asked whether he formed his opinion after speaking with Detective Sean Reilly of the Montgomery County Police; if there was evidence of blood on appellant's right hand; if he knew of a certain study concerning over 100 cases of self-inflicted gunshot wounds to the head; whether the projected blood from the gunshot would have been on the hand of a person located in a certain position near the victim; and, whether there

should have been more blood on the appellant's pants when the blood was projected from the victim.

Dr. Vosburgh was also questioned about his conclusions concerning the stains in the carpet, including whether the patterns actually were formed by the presence of a hand. Dr. Vosburgh agreed that he did not examine the blood stained carpet before he provided his original report, and that he did not visit the crime scene. Finally, Dr. Vosburgh admitted that he did initially intend to submit an invoice for his work in this case, at the hourly rate of $250. However, he decided not to submit an invoice because of the difficulty of separating the time he worked on this case from other work he performed for the District of Columbia.

In addition to this direct impeachment of Dr. Vosburgh's opinions, it is more than clear that the defense experts disagreed with Dr. Vosburgh's conclusions in this case. Both defense experts were of the opinion that the "v" shaped void pattern that Dr. Vosburgh attributed to appellant's sneaker being on the carpet at the time of the initial bleeding could not have been made by appellant's sneaker because the void was "v" shaped, while the sneaker was rounded and would have left a void in a similar shape. Both defense experts examined the handprint on the rug and concluded that this was not a void caused by a hand being on the carpet at the time of the initial bleeding, as was Dr. Vosburgh's opinion, but rather, was made by blood being transferred from a bloody palm onto the rug. In sum, the jury had more than sufficient information to assess Dr. Vosburgh's credibility and his opinions, even without evidence concerning his testimony in several unrelated trials.

## V.

Appellant next asserts that he did not have notice of the substance of the opinions of a State's expert witness, Dr. Jonathan Arden, and that the trial court erred in permitting Dr. Arden to testify in rebuttal. The State responds that the record establishes that appellant had notice the State would

call Dr. Arden, and that Dr. Arden's opinion was not in writing, but was based on a review of the transcript of Dr. Di Maio's testimony in this case. We conclude that, even if there were a discovery violation, the violation was harmless beyond a reasonable doubt. Moreover, the trial court properly exercised its discretion in permitting the rebuttal testimony.

Appellant was notified prior to trial that the State might call Dr. Jonathan Arden as "an expert in forensic pathology in rebuttal." On the last day the jury heard evidence, defense counsel objected on the grounds that he had not received notice of the substance of Dr. Arden's testimony. After ascertaining that the State did not have a written opinion from Dr. Arden, the objection was overruled.

Thereafter, Dr. Arden testified to his qualifications as an expert. While renewing his objection at the end of this voir dire, defense counsel conceded that he was informed that Dr. Arden would testify this case was a homicide. Dr. Arden was accepted as an expert in forensic pathology.

Dr. Arden then testified that he reviewed a transcript of Dr. Di Maio's testimony from this case, as well as reports from the other experts. Dr. Arden did not have an opinion whether this case was a suicide, but he did have several opinions concerning Dr. Di Maio's findings. In sum, Dr. Arden opined that he thought Dr. Di Maio erred by not considering some of the blood spatter and blood transfer evidence in this case, and that he did not adequately consider the staged crime scene, *i.e.,* the fact that the gun was removed from the scene by appellant.

Thereafter, when Dr. Arden began to explain the source of his disagreement with Dr. Di Maio about the blood spatter evidence, defense counsel objected, asserting that they were not permitted to go into enough detail with Dr. Di Maio about the blood spatter evidence. The State disagreed with defense counsel's claim that Dr. Di Maio did not testify concerning the blood evidence in this case and argued that Dr. Arden's testimony was proper rebuttal. The court then reminded defense counsel of Dr. Di Maio's testimony concerning the

wound to the victim, his determination that the wound was self-inflicted, and agreed that Dr. Arden's testimony was a proper subject for rebuttal.

After the bench conference, Dr. Arden testified that he concluded that Dr. Di Maio did not correctly incorporate the blood pattern analysis into his determination that this was a self-inflicted wound. More specifically, Dr. Arden thought that it was critical to consider the blood stains on appellant's pant leg and shoe in determining where appellant was located at the time of the shooting, and that it was Dr. Arden's understanding that Dr. Di Maio did not consider these factors.

Defense counsel's cross-examination of Dr. Arden covered a variety of areas, including, but not limited to, when and how the blood in the "v" shaped void would have been deposited on the carpet. On rebuttal, Dr. Arden concluded that the amount of blood spatter on appellant's clothing and shoes was "inconsistent with walking through that dripping for one second."

Initially, we consider appellant's claim that, although he had notice that Dr. Arden would testify, he was not informed of the substance of any oral reports Dr. Arden would provide at trial. Appellant primarily relies on *Hutchins v. State*, 339 Md. 466, 663 A.2d 1281 (1995) and former Maryland Rule 4–263(b)(4), which requires the State to provide the defense with written reports made by experts consulted by the State, as well as the substance of their oral reports and conclusions. In the Court of Appeals's *Hutchins* opinion, although agreeing with this Court's finding in *Hutchins v. State*, 101 Md.App. 640, 650, 647 A.2d 1271 (1994), that the State was required to disclose reports of experts which it had consulted, the Court of Appeals disagreed with this Court's finding that the failure was harmless beyond a reasonable doubt. *Hutchins*, 339 Md. at 480, 663 A.2d 1281.[16] Therefore,

---

16. The Court of Appeals ruled the discovery violation was not harmless in *Hutchins* because the State's rebuttal experts contradicted factual evidence presented by the defense in that case, and the record established that the trial judge relied on the testimony of these experts in

this Court's explanation of the provisions of Md. Rule 4–263(b)(4) remains instructive:

> Rule 4–263(b)(4) is based on the recognition that the prosecutor is not always able to determine what is exculpatory or what is material to the defense. It avoids trial by ambush. If an agent of the State has consulted an expert, the defendant is entitled to disclosure of that expert's *conclusion.*
>
> This disclosure obligation is easy to satisfy. It relieves the State of any obligation to determine what conclusions are exculpatory or material to the defense. It is limited to disclosure of "any ... oral or written reports by (the expert) ... not the sum and substance of the (the expert's) proposed trial testimony." Moreover, it is applicable only to *conclusions* of experts who have actually been "consulted." A consultation involves a request by the State that the expert perform some task in order to reach a *conclusion.*

*Hutchins,* 101 Md.App. at 649, 647 A.2d 1271 (citations omitted, emphasis added); *accord Canela v. State,* 193 Md.App. 259, 311–12, 997 A.2d 793 (2010), *cert. granted,* 416 Md. 272, 6 A.3d 904, No. 342, Sept. Term, 2010 (Oct. 20, 2010).

Here, prior to calling Dr. Arden, the State simply informed the court and defense that Dr. Arden would be a rebuttal witness and that the State had not been provided with his opinions as of yet. On appeal, appellant contends that, "[p]resumably, the State did not call Dr. Arden as a witness without having any idea as to what he would say." We do not disagree with this assertion. Therefore, at least at this point, we agree that the State violated Md. Rule 4–263(b)(4) by not informing defense counsel of Dr. Arden's conclusion.

That, however, does not end our inquiry because even discovery violations may constitute harmless error. *See Williams v. State,* 364 Md. 160, 169, 771 A.2d 1082 (2001) ("If the trial judge erred because the State did in fact violate the

---

large part in reaching his verdict. *Hutchins,* 339 Md. at 478–480, 663 A.2d 1281.

discovery rule, we consider the prejudice to the defendant in evaluating whether such error was harmless"); *see also Hutchinson v. State,* 406 Md. 219, 227–228, 958 A.2d 284 (2008) (applying harmless error standard to a discovery violation and concluding that the error was not harmless); *Thanos v. State,* 330 Md. 77, 96–97, 622 A.2d 727 (1993) (assuming that there were discovery violations which "in fact surprised" appellant, any violation was harmless in light of confession to murder and independent corroboration).

■ Appellant's primary complaint as to Dr. Arden's testimony concerns his opinions regarding the blood spatter evidence. However, immediately prior to such testimony, the State informed defense counsel that "Dr. Di Maio made a finding based upon the blood spatter. He's going to rebut his finding and also the blood spatter people . . .". At this point, defense counsel explicitly knew the subject of Dr. Arden's testimony, and by implication, Dr. Arden's conclusion. Further, it is doubtful, given the circumstances of this case, that defense counsel was surprised by the proffered testimony.

■ Indeed, this is not a case where blood spatter evidence suddenly was sprung on appellant on the last day of this two week trial. Clearly, this case was a battle of experts, both for the State and the defense, and defense counsel demonstrated a command of the subject matter throughout this long and hard-fought trial. As this Court has stated, "[a]ssuming that they should have been discovered pretrial, the appellant yearns for a sanction which is excessive." *Ross v. State,* 78 Md.App. 275, 286, 552 A.2d 1345, *cert. denied,* 316 Md. 365, 558 A.2d 1207 (1989); *see also Thomas v. State,* 397 Md. 557, 572, 919 A.2d 49 (2007) ("Exclusion of evidence for a discovery violation is not a favored sanction and is one of the most drastic measures that can be imposed"). The purpose of discovery is "to prevent a defendant from being surprised. Its intention is to give a defendant the necessary time to prepare a full and adequate defense." *Ross,* 78 Md.App. at 286, 552 A.2d 1345. It is unlikely that defense counsel was surprised by Dr. Arden's testimony.

As for appellant's remaining contention that Dr. Arden's testimony was improper rebuttal, we are not persuaded. Appellant's claim is based on the prosecutor's question of Dr. Arden: "Do you have an opinion as to Dr. Di Maio's failure to incorporate the blood pattern analysis correctly into his determination?" Appellant asserts this was improper because "Dr. Di Maio was not permitted to testify as to how the blood spatter evidence factored into his opinion." Further, appellant contends that, when Dr. Di Maio attempted to discuss his findings with regard to the blood spatter evidence, the State's objection was sustained and the testimony was stricken from the record.

While the court did sustain an objection to some of Dr. Di Maio's testimony, Dr. Di Maio, in fact, offered a significant amount of testimony concerning blood spatter in this case. During Dr. Di Maio's direct examination, he was asked whether the analysis of "how fast blood comes out of the head after a gunshot wound" is the province of a forensic pathologist, his area of expertise, or of a blood spatter expert. Dr. Di Maio replied this was forensic pathology because the study of wound ballistics is usually performed by physicians. Dr. Di Maio then testified to the manner in which a contact gunshot wound creates pressure as the bullet enters the body, and how, as a result of that pressure and energy, "blood and tissue then tends to be ejected out of the entrance hole ..." He continued that, considering the wound in this case, "the blood and tissue comes out at random. It does not come out in a homogenous way." Further, the blood "does not come out in an arc. It comes out purely by chance." Additionally, Dr. Di Maio commented that, "[i]n this case, there's even more chance, because you don't have a round hole. You have an irregular hole, which means that there is even greater inconsistency in how the blood and the tissue is ejected."

Dr. Di Maio also was asked about the absence of blood on McQueen's right hand, and indicated that did not matter "because the majority of the times in contact wounds you do not get blood blown back on the hand." He further indicated blood was not present in approximately two-thirds of cases

under such circumstances. Dr. Di Maio also was permitted to testify, over the State's objection, that if someone touched the wound even briefly, "you wouldn't see any evidence." Further, "just putting your fingers in there, you're not going to see imprints because there's blood in the hair."

In the final analysis, while the State did not disclose Dr. Arden's conclusion prior to that witness taking the stand, given that the subject matter concerning that conclusion was proffered before Dr. Arden offered any testimony on the subject, and given that blood spatter evidence was a significant portion of both the State's and the defense's case, any discovery violation was harmless beyond a reasonable doubt. Moreover, as the defense expert did offer testimony concerning blood spatter, Dr. Arden's testimony was proper rebuttal evidence.

## VI.

Appellant next asserts that the court erred in not granting a mistrial in response to certain argument by the prosecutor during closing argument. The State disagrees and contends that, even if improper, a mistrial would have been an extreme sanction that was not warranted in this instance. We agree with the State.

Towards the end of the State's rebuttal closing argument, the State suggested "You don't have to psychoanalyze Gary Smith. That's not on your verdict sheet. You don't have to ask the whys. I even told you in opening, most of these cases, they raise more questions than they answer. But that's not going to be on your verdict sheet."

The prosecutor continued:

It's been 18 months since Michael McQueen was buried. This defendant shot him. It's time for justice. Healing begins when justice occurs. And the only just verdict in this case, the only proper verdict in this case is to hold that person responsible for the physical evidence shows, no matter what experts you want to believe, that he was right there when he was shot. What your common sense and

understanding shows that you don't stage a scene, you don't throw away a gun, you don't lie and lie and lie and lie to the police, unless you're guilty as sin. Leave the whys to Judge Johnson in the sentencing.

At this point, defense counsel objected, and the objection was overruled. The State then concluded by asking the jury to return a verdict of guilty in this case. At a bench conference after these remarks, defense counsel moved for a mistrial and that motion was denied.

 The Court of Appeals has consistently stated that counsel is afforded considerable leeway in closing argument, and that regulation of closing arguments falls within the sound discretion of the trial court. *See Mitchell v. State*, 408 Md. 368, 380, 969 A.2d 989 (2009) ("Generally, counsel has the right to make any comment or argument that is warranted by the evidence proved or inferences therefrom") (quoting *Wilhelm v. State*, 272 Md. 404, 412, 326 A.2d 707 (1974)). Although arguments must be limited to the issues in the case on trial, the evidence, and any reasonable inferences, counsel is allowed "liberal freedom of speech." *Wilhelm*, 272 Md. at 413, 326 A.2d 707. Improper closing argument remarks will only warrant reversal if they "actually misled the jury or were likely to have misled or influenced the jury to the prejudice of the accused." *Spain v. State*, 386 Md. 145, 158, 872 A.2d 25 (2005) (quoting *Degren v. State*, 352 Md. 400, 431, 722 A.2d 887 (1999)).

 Even assuming that the prosecutor's singular statement during rebuttal was improper, we conclude it was not so prejudicial as to warrant the extreme remedy of a mistrial. Appellant primarily relies on *Fryson v. State*, 17 Md.App. 320, 301 A.2d 211 (1973). In that case, the appellant was convicted of attempted robbery with a dangerous and deadly weapon. *Id.* at 321, 301 A.2d 211. During closing argument, the prosecutor informed the jury during rebuttal closing argument that, "if the appellant was found guilty, he would 'be put on probation,' and that the trial court has access to 'plenty of parole officers, and social workers and things like that.'" *Id.*

at 323, 301 A.2d 211. We stated that "[s]uch remarks on the part of the prosecutor are highly prejudicial." *Id.* at 324, 301 A.2d 211.

In reaching this conclusion, we relied on *Shoemaker v. State,* 228 Md. 462, 180 A.2d 682 (1962), wherein the Court of Appeals wrote that "statements with regard to parole in the context in which they were made here, we think, exceeded the limits of permissible comment by the prosecutor." *Fryson,* 17 Md.App. at 324, 301 A.2d 211 (quoting *Shoemaker,* 228 Md. at 468, 180 A.2d 682). Further, we noted that the Court of Appeals indicated that "[r]eferences by a prosecutor to the right of appeal, the possibility of executive clemency and parole of a defendant," had been considered by many other jurisdictions and that the "weight of authority are against the propriety of such arguments." *Id.* Accordingly, we concluded that, "[u]nder the circumstances of this case, the sustaining of an objection to the egregious remarks, standing alone, fell short of curing the deleterious effect that the ill-considered comments may have had on the jury." *Fryson,* 17 Md.App. at 326, 301 A.2d 211.

*Fryson* is distinguishable from this case because, although the prosecutor herein stated "[l]eave the whys to Judge Johnson in the sentencing," that remark was not akin to a promise to the jury that the defendant would be "put on probation" or given a particular lenient sentence in exchange for a guilty verdict. Likewise, we conclude that appellant's reliance on *Johnson v. State,* 325 Md. 511, 601 A.2d 1093 (1992), is similarly misplaced. There, the prosecutor informed the jury that, even if they found Johnson guilty, that was not the end of the legal process, because Johnson would have access to the appellate courts of this State, and possibly, the Supreme Court of the United States. *Johnson,* 325 Md. at 513, 601 A.2d 1093. Those remarks were clearly improper as it was an "attempt to put the responsibilities of the jurors on some other body." *Id.* at 518, 601 A.2d 1093.

Moreover, under certain circumstances, a prosecutor's rebuttal argument responding to comments made by the defense

during its closing must be placed in context and may be entirely appropriate. *See Degren,* 352 Md. at 431–32, 722 A.2d 887 (concluding that, while prosecutor's comments were "unprofessional and injudicious," reversal was not required under the circumstances). Here, while most of the defense's closing argument focused on the scientific evidence in this case, defense counsel also attempted to explain why appellant gave the different version of events and "why he did what he did with respect to the lake." Counsel stated: "Is there any doubt in anybody's mind that Gary Smith is a paranoid individual? Okay? Let's say crazy paranoid. But he's a little paranoid." Counsel then reminded the jury about appellant's service overseas, then about the circumstances surrounding the crime scene, including the presence of marijuana and beer bottles, and that appellant reacted in "a terribly unfortunate way."

Thus, asking the jury to consider "why" appellant acted as he did was suggested by defense counsel during closing argument. The prosecutor's rebuttal argument suggesting that the jury need not consider the reasons why appellant may have shot McQueen in this case did not amount to reversible error. Thus, the trial court properly denied the motion for mistrial.

## VII.

Finally, appellant asserts that the trial court's questioning of Dr. Allan and Dr. MacDonnell reinforced the State's theory of the case and denied him his right to a fair and impartial trial. The State responds that the limited questions of these two witnesses was merely an attempt "to clarify arguably confusing testimony in a long and complicated case." Further, considering that the jury was instructed concerning inferences to be drawn from the court's questions, the State maintains that any error was harmless beyond a reasonable doubt.

It is well settled that a judge may question witnesses during trial. *See* Md. Rule 5–614(b) ("The court may interro-

gate any witness. In jury trials the court's questioning must be cautiously guarded so as not to comment on the evidence or convey the court's opinion of the witness's credibility"); *see also Diggs v. State*, 409 Md. 260, 292, 973 A.2d 796 (2009) ("[W]hile we agree with the court below that a judge presiding over a jury trial has the right to interrogate witnesses in an effort to clarify the issues, we stress that he should exercise this right sparingly") (citation omitted). This Court has stated that "[t]he principal justification for a trial judge to inject himself or herself into the questioning of a witness is to clarify issues in the case." *Smith v. State*, 182 Md.App. 444, 480, 957 A.2d 1139 (2008) In addition, "[t]he trial court's intervention may be particularly helpful in instances where relevant evidence has not been adduced by counsel or the evidence adduced is unclear or confusing." *Smith*, 182 Md.App. at 481, 957 A.2d 1139.

Appellant's first allegation is that the court erred in asking Dr. Allan about the gunshot residue in this case. The court asked Dr. Allan, assuming that someone other than McQueen was in the room at the time of the shooting and then was tested hours later, whether those facts would affect the reliability of the GSR test. After Dr. Allan replied in the affirmative, defense counsel objected, but stated that he had no further questions based on the court's question.

This question was a clarification of matters already before the jury. Dr. Allan had provided testimony about GSR during direct examination, including that testing of McQueen was done at the scene and, because the body had not been moved, there was no risk of contamination. Dr. Allan was also questioned about the GSR during cross-examination, where she explained that the fact that gunshot residue may be on a "living individual," presumably appellant, did not influence her opinion.

Next, appellant takes issue with several questions the trial court asked of the defense expert, Professor MacDonnell. During Professor MacDonnell's voir dire, he testified that he had been accepted as an expert in blood stain pattern analysis

in fourteen cases where the issue was whether the death was accident, suicide, or homicide. At the conclusion of his testimony, the trial court asked how many of those cases involved a situation where the gun was not found at the scene. MacDonnell could not recall but agreed that normally, in the case of suicide, "the gun is not going to go very far away, unless someone else moves it." The court then asked whether the presence of the gun would affect his opinion, and MacDonnell replied that "[i]t would support it, actually."

Appellant contends that these questions "focused the jury's attention on the fact that the gun was missing from the scene . . ." However, as the State points out, this was never an issue in this case, because it is clear that appellant admitted to removing the gun himself, throwing it in a nearby lake, and then helped police recover the gun.

The second series of questions that appellant takes issue with concerns questions asked by defense counsel about appellant's attempt to "blot the flow of the blood on the left side of the head for a short period of time", whether MacDonnell expected blood flow from the victim's head to "drop as a result of the hand blocking the flow of the blood," to which he replied, in part: "If someone blocks that, it's going to instantly cut the, coat the hand."

Thereafter, the court asked: "If the wound is blocked by a hand, I believe you said that it would cause the hand to be covered with blood, because an arterial wound is gushing. Is that accurate?" MacDonnell agreed, stating "[i]nstantly, yes." The court then asked: "Does it follow, a fortiori, that if there's something in the hand, that object would be covered with blood?" After MacDonnell agreed with that question, the court then asked, over objection, "if a gun was in somebody's hand, and it was a gushing arterial wound, is your opinion that it would be—that the gun and the hand could be . . . covered with blood?" Again, Professor MacDonnell agreed that, in that scenario, the gun and the hand would be covered with blood.

Appellant contends that this series of questions "appeared to favor the State in an area that was hotly contested by both sides, the significance of a lack of blood spatter on the back of the decedent's hands." We disagree. Based on our review of the entire record, and given the actual context of the court's questions, we conclude the question did not concern the lack of blood spatter on McQueen's hands. This is especially true given Professor MacDonnell's testimony that blood stains were on McQueen's right arm, indicating to him that McQueen's arm was up above his shoulder at the moment of impact. Instead, the court's questions addressed appellant's claim that there was blood on his hands because, at some point, he touched McQueen's head and neck, and may have attempted to block the flow of blood from the wound.

It is not clear how these questions were prejudicial to appellant. There does not appear to have been any evidence concerning the presence of blood on the gun. Given that appellant disposed of the gun in a lake for a period of time, we presume that both parties determined further testing of the outside of the gun would have been fruitless. The court's questions did not convey a partiality in favor of the State's case.

Finally, appellant contends that the trial court improperly interrupted his cross-examination of Dr. Allan when she was called in rebuttal. The State responds that this issue was not preserved and is without merit in any event. We agree.

Dr. Allan was called as part of the State's rebuttal, testifying that she had reviewed Dr. Di Maio's testimony in this case, which included testimony concerning a case study of approximately 1,702 or 1,704 suicides in San Antonio, Texas. It was her opinion that this study was not useful in this case because the study did not differentiate between gunshot wounds sustained in suicides as opposed to those found in homicide cases. Dr. Allan also discounted Dr. Di Maio's reliance on statistics because the study did not differentiate based on demographics such as race.

Dr. Allan also noted that one of the other studies relied on by Dr. Di Maio, involving the number of times blood spatter would appear on the back of a suicide victim's hand, only involved a small percentage of cases using a .38 caliber revolver, as was used in this case. Dr. Allan testified that there were nine cases in that particular study involving a .38 revolver, and in only four of those did the results come back positive for blood spatter.

On cross-examination, defense counsel questioned Dr. Allan about the study involving blood spatter on the back of the hands of suicide victims. Defense counsel asked if that study concluded that 33 percent of cases of self-inflicted wounds from revolvers had blood spatter on the back of the victim's shooting hand. Dr. Allan agreed that was the correct figure for revolvers, and that, in cases where a pistol was used, the statistic was 35 percent.

At this point, the State objected that this was irrelevant. The court agreed, and asked to look at the study. After clarifying that the study found that, in 33 out of 103 gunshot suicides, blood spatter was detectable by the naked eye on the back of the suicide victim's hand, the court stated that this was "different from saying whether it's present or not present." After defense counsel indicated he would move on, the court stated, "[i]f we're going to quote these things, we need to do it accurately."

By agreeing to "move on," we concur that defense counsel acquiesced to the court's ruling. *See Grandison v. State*, 305 Md. 685, 765, 506 A.2d 580 ("By dropping the subject and never again raising it, [appellant] waived his right to appellate review"), *cert. denied*, 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986); *see also Whittington v. State*, 147 Md.App. 496, 537, 809 A.2d 721 (2002) (holding that, where defense counsel did not dispute trial court's ruling limitation on expert testimony, the issue was not preserved), *cert. denied*, 373 Md. 408, 818 A.2d 1107, *cert. denied*, 540 U.S. 851, 124 S.Ct. 136, 157 L.Ed.2d 92 (2003).

■ Moreover, we are not persuaded that the court's request to look at the study and quote from it conveyed a bias in favor of the State, or that it somehow suggested that defense counsel was being intentionally misleading. There is always a danger that a jury may be heavily influenced by statistics and we discern no abuse of discretion in the trial court's statements here. *See, e.g., Wilson v. State*, 370 Md. 191, 202, 803 A.2d 1034 (2002) ("Statistics are inherently flexible, and thus there are usually multiple correct statistics that can be used to describe the same set of data"). For the most part, the court's questions were simply clarification of issues already before the jury. Moreover, given our review of the entire record, there was no demonstrated partiality of the court favoring one side or the other, and appellant was fully afforded his right to a fair and impartial trial.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**

